Huke v. Huke.

---

FRIEDA HUKE, by next Friend, etc., Plaintiff in Error, v. WILLIAM HUKE, Defendant in Error.

**St. Louis Court of Appeals, March 24, 1891.**

**Equity:** PARENT AND CHILD. A minor child has no right of action in equity against its father to compel him to maintain or educate it during its minority.

*Error to the St. Louis Circuit Court.*—HON. DANIEL D. FISHER, Judge.

AFFIRMED

*Frank M. Estes* and *Willis H. Clark*, for plaintiff in error.

(1) Chancery has jurisdiction over the persons of infants and has power and authority to make and enforce all necessary and proper orders for their care, custody and maintenance. Story, Equity Juris., secs. 1332, 1333 and 1334; Bispham on Equity, secs. 542, 546; Adams on Equity, p. 281; *Cowls v. Cowls*, 8 Ill. 435; *Wellesley v. Beaufort*, 2 Russell, Ch. Rep. 21, 22, 23; *People v. Chegary*, 18 Wend. 643; 1 Minor's Institute, p. 402. (2) Such chancery jurisdiction in this country does not necessarily depend upon the existence of an estate or property belonging to the infant, and in the absence of such estate or property chancery will still act for the protection of the infant as regards care and custody, and will enforce maintenance against the delinquent parent. Adams' Equity, p. 281; *Aymar v. Roff*, 3 Johns. Ch. 49; *Courtright v. Courtright*, 40 Mich. 633; *Pritzmeyer v. Pritzmeyer*, 45 Ohio, 452. (3) A special statutory power granting to another court the power to appoint guardian for minors is not exclusive and does not divest the general chancery jurisdiction respecting the care, custody and maintenance of infants. Story's Equity Juris., secs. 1338, 1339, 1340; Bispham's Equity, sec. 542; *Lee v. Lee*, 55 Ala. 590; 2 Kent's Com., p. 227; *In re Andrews*, 1 Johns. Chan., p. 99; *Ex parte Crumb*, 2 Johns. Chan. Rep. 439. (4) The jurisdiction of chancery to remove an improper guardian, either natural or appointed, of a minor and to appoint a suitable guardian in place of the one removed and to enforce maintenance for such minor, will be exercised

upon the filing of a bill in equity on behalf of the infant containing a sufficient statement of the fact and praying for protection. Adam's Equity, 281 ; Story's Equity, sec. 1339 ; *Aymar v. Roff*, 3 Johns. Chan. 49 ; 1 Minor's Inst., p. 402.

*Rassieur & Schnurmacher*, for defendant in error.

THOMPSON, J.—This action is brought by a daughter, seventeen years of age, by her next friend, against her father for support and maintenance. The circuit court sustained a demurrer to the petition, and the plaintiff prosecutes this appeal. The petition is as follows :

"Your petitioner, Frieda Huke, by Thomas P. Bashaw, her next friend herein appointed, respectfully represents and shows : That petitioner is a resident of the city of St. Louis, state of Missouri, aged seventeen years, and the daughter of defendant, William Huke, by Amelia Huke, his wife, who died in said city of St. Louis on the thirteenth day of November, 1888 ; that continuously from her birth, until the date hereinafter mentioned, petitioner resided with and remained under the guardianship and control of her father, said William Huke, and dependent upon him for her support, for necessaries and for mental and moral training and education ; that, on or about the first day of July, 1890, petitioner's father, said William Huke, forcibly by commands, threats and duress, compelled petitioner to depart from and to leave his house and home without money or means or provision for her subsistence, and has continuously since failed, neglected and refused to resume, exercise or perform any of his duties as her parent and natural and legal guardian, and has utterly and wholly renounced and abandoned all his said duties, and has failed, neglected and refused to make provision, or to supply any money or means, for petitioner's care, custody and guardianship, for her support,

for her necessaries, or for her mental and moral training and education; that for many years last past defendant, William Huke, has been, and still is, the owner of a large amount of property, and engaged in prosecuting an extensive and profitable business in said city of St. Louis, and possessed of a large income, and is well able financially to make provision for petitioner's needs in the premises; that petitioner is wholly destitute, has no funds, property or resources of any kind; that, by reason of her youth, sex and lack of education and experience, she has been and is unable to secure employment or to earn the means of subsistence; that she is without a home, and that she has no abiding place, food or raiment, save such as are bestowed upon her in friendship and charity; that she is without means or provision, or hope of obtaining same, for the furtherance of her mental and moral training and education; that, for her relief, she has incurred debts and obligations beyond her capacity to pay, and her credit is now exhausted; that the petitioner is wholly without hope or prospect of relief, and without remedy at law, or any remedy whatsoever, save through the intervention of this honorable court in enforcing against her father, said William Huke, petitioner's right to a just, adequate and suitable provision for her wants in the premises. Wherefore, petitioner, by Thomas P. Bashaw, her next friend aforesaid, prays this honorable court to grant herein its order and command to said William Huke, requiring and directing him to appear before this court at a time in said order to be stated, then and there to show cause, if any there be, why he should not be ordered, directed and required by this honorable court to furnish and pay over, *pendente lite*, and from time to time, the necessary funds and means for the supplying of petitioner's wants in the premises during the remainder of her minority, and for her necessary cost and expenses herein, and further to show cause, why this honorable court should not appoint in that behalf a suitable

person to act under the orders and direction of the court as petitioner's acting guardian in the premises; and petitioner further prays the court, through Thomas P. Bashaw, her next friend aforesaid, that, upon the return to said order, and upon the final hearing hereof, this honorable court may by order and decree herein order, direct and require said William Huke to furnish and pay over, *pendente lite*, and from time to time, the necessary funds and means for the supplying of petitioner's wants in the premises during the remainder of her minority for her support, for necessaries, mental and moral training and education, for her costs and expenses herein, and that this honorable court may, for the accomplishment of such purposes, nominate and appoint a suitable person to act *pendente lite*, and until petitioner attains her majority, under the orders and direction of this honorable court, in receiving such funds and means from said William Huke, and applying same for the purposes aforesaid for the benefit of petitioner, and for such other and further relief as may seem meet and proper and within the powers of this honorable court.''

This action proceeds in the face of elementary principles. By the common law of England a father is not bound to support his infant child in the sense that the obligation has any legal sanction; no action can be maintained against him, without the aid of statute, to compel him to discharge this natural duty. By that law a father is not liable, as upon an implied contract, to a stranger who furnishes necessaries for the support of his infant child. *Urmston v. Newcomen*, 4 Ad. & El. 899; *Mortimore v. Wright*, 6 Mees. & W. 482; *Seaborne v. Maddy*, 9 Car. & P. 497; *Hodges v. Hodges*, Peake Ad. Cas. 79. On this point many of the American courts follow the English rule, but some of them have departed from it and adopted the more humane principle, that the moral obligation of the father to support his infant child is sufficient to raise an implied promise to pay for necessaries furnished to a child by a stranger.

Huke v. Huke.

See, for instance, *Gotts v. Clark*, 78 Ill. 229 ; *Hunt v. Thompson*, 3 Scam. ( Ill.) 179. I have looked through our Missouri cases without satisfying myself what the state of our law is on this question of the father's liability for necessaries. But the intimations of those cases are such that we may concede that, under our law, a father is liable to a stranger for necessaries furnished to his infant child. *Rogers v. Turner*, 59 Mo. 116 ; *St. Ferdinand Academy v. Bobb*, 52 Mo. 357 ; *Girls' Home v. Fritchey*, 10 Mo. App. 344. And yet it does not follow that such an action as the present will lie.

No instance is found in the books, where such an action as the present has been maintained, either at law or in equity. At one period in our English history a statute was enacted that, if any popish parent should refuse to allow his Protestant child a fitting maintenance, with a view to compel him to change his religion, the lord chancellor should, by order of the court, constrain him to do what is just and reasonable. Stat. 11 & 12 W. 3 Ch. 4. The very enactment of this statute,—the necessity in the state of the law for such a statute,—shows that a father was under no compulsory obligation at common law, or by the principles of equity, to support his infant child. A case arose after the passing of this statute, making this conclusion still more clear. The daughter of a wealthy Jew had embraced Christianity, and he turned her out of doors. On the petition of the parish for relief against him, they were held entitled to none, because it was not alleged that she was poor or likely to become chargeable. 1 Ld. Raym. 699. This gave occasion for another statute, which ordained that, if Jewish parents should refuse to allow their Protestant children a fitting maintenance, suitable to the fortune of the parents, the lord chancellor, on complaint, might make such order as he should see proper. Stat. 1 Anne, Ch. 30 ; 1 Bla. Com. 449.

But it is suggested, in argument, that this petition is addressed to the chancery powers of the circuit court,

and that the chancellor of England had, in virtue of a delegated authority from the king as *parens patriæ*, or, as was sometimes said, the father of the fatherless, a power to require a father, having the means, to set apart a fund for the support of his indigent minor child. That court has again and again asserted a species of vice-regal power over the custody and education of children, in virtue of a delegated authority from the king as *parens patriæ*. But the extent to which the court has gone in the exercise of this power has been to make orders disposing of the custody of infant children, and directing a scheme of education out of their own property, when they had property out of which such a scheme could be directed. At one time there was considerable opinion to the effect, that the jurisdiction of chancery in this regard rested upon property; and, therefore, it was a common practice for some relative of a child, desiring to obtain an order of chancery, taking the child away from the father for misconduct of the latter, to settle upon the child a certain amount of property. But it was finally settled that the jurisdiction did not rest on property (*In re Spence,* 2 Phil. 247 ; *In re Fynn,* 2 De Gex & Sm. 457, 481); though the chancellors often refused to exercise it in cases where the infant had no property, because, without the aid of property, it could not be conveniently and beneficially exercised. *In re Fynn, supra.*

In the exercise of that jurisdiction it will appear that the English court of chancery went so far as to level orders and decrees against parents and guardians residing in foreign countries—in France and America, and that it stood ready to enforce those decrees by imprisoning the defendants in the Fleet, whenever they should set their feet upon the soil in England—a jurisdiction which, it may be assumed, no American court would dare to exercise. But, while thus attempting a tyrannical and extra-territorial jurisdiction against parents, no court of chancery in England ever made an

order requiring a father, however wealthy, to set apart out of his own estate a fund for the maintenance and education of his infant child, or even to provide sustenance for such child. The common law of England has, from the earliest times, left this duty to the natural feelings of the parents, and experience has shown that the confidence has not in general been misplaced. If distressing circumstances to the contrary sometimes arise, the most that can be said is that they illustrate a profound defect in the common law. The court cannot remedy this defect, for the courts have no legislative power. Arguments, addressed to us upon the reason and humanity of the rule which would sustain this action, are vain. They are addressed to a tribunal which has no jurisdiction to change the law of the land.

We have been referred to the case of *Cowls v. Cowls*, 8 Ill. 435, in which the court sustained an action by a divorced wife against her husband for the maintenance of the children of the marriage. Without reference to the ground on which the relief was put, it is sufficient to say that it is no authority for the present action. The action was brought by a wife, who had been divorced against her late husband, and it may be assumed that the court still possessed jurisdiction over the subject of alimony and maintenance. But, whatever may be said of the ground on which that case proceeded, we are obliged to say that a single decision cannot change a rule of the common law which has been settled for ages.

The view which we take of this petition renders it unnecessary to consider whether, in view of the jurisdiction over the guardianship of minors, which our statutes have vested in the courts of probate, such a jurisdiction as is here invoked could be held to exist in the circuit courts in any event.

The judgment will be affirmed. All the judges concur.