## Richmond.

NATIONAL VALLEY BANK OF STAUNTON, VA., v. HANCOCK AND
                        OTHERS.

100 101
110   4

January 23, 1902.

Absent, Harrison and Whittle J. J.

1. FRAUD—*Improvements on Another's Land—Rights of Creditors.*—Improvements put upon the property of another by an insolvent debtor may be followed by his creditors, and the realty on which they are placed may be charged with their value.
2. ASSIGNMENTS—*Right to Avoid Prior Fraudulent Conveyance.*—A purchaser of a pre-existing note may sue in equity to avoid a conveyance made in fraud of the rights of the holder before his purchase. The rule that a mere naked right to sue to avoid a fraud is not assignable does not apply to a case where such right is merely incidental to a subsisting substantial property which has been assigned, and which is itself intrinsically susceptible of legal enforcement.
3. TRUSTS AND TRUSTEES—*Support of Beneficiary—Discretion—Fraud—Injury to Creditors.*—Where a father who is trustee for his wife and children, and as such invested with a discretion to spend the income of the trust subject for their maintenance and support, collects the income, and mingles it with his own, and makes extensive improvements on the trust subject, but settles no account of his transactions, he will not be permitted, to the prejudice of his creditors, to assert that he has supported his wife and children from his private means, so as thereby to enhance the value of the trust subject. He will be held to have supported them out of the trust funds, and his creditors will be permitted to follow his estate into the trust subject.
4. TRUSTS AND TRUSTEES—*Express Trust—Support of Children.*—A devise to a father for the support and maintenance of his wife and children creates an express trust for the latter, and the income derived

from the trust subject must be so applied irrespective of the father's ability to support and maintain them.

Appeal from a decree by the Circuit Court of the city of Lynchburg, pronounced October 9, 1900, in a suit in chancery, wherein the appellant was the complainant, and the appellees were the defendants.

*Reversed.*

The opinion states the case.

*Harrison & Long,* for the appellant.

*Caskie & Coleman* and *Wilson & Manson,* for the appellees.

KEITH, P., delivered the opinion of the court.

It appears from the bill that the National Valley Bank of Staunton, on the 20th of December, 1894, discounted for the Traders' Bank of Lynchburg its note for $5,000, which, after being curtailed from time to time, was renewed on the 19th of December, 1896, for $3,150, at sixty days. Along with this note certain collaterals were delivered, from which there was realized the sum of $1,150.25. Those uncollected were returned to the Traders' Bank, and in place of them the Bank of Staunton received six notes as security for its debt. The collaterals thus received were three notes of Rucker, Clark & Co., dated August 23, 1894, payable thirty-nine months after date to James Hancock, and endorsed by James Hancock and the Traders' Bank of Lynchburg, each for the sum of $225.20; two notes of P. V. Rucker, dated October 1, 1894, payable three years, and forty-two months, respectively, after date, to Rucker, Clark & Co., and endorsed by Rucker, Clark & Co., James Hancock, and the Traders' Bank of Lynchburg, each for $250; and one note of W. E. Clark, dated October 1, 1894, payable thirty-nine months after date to Rucker, Clark & Co., and endorsed by Rucker,

Clark & Co., James Hancock, and the Traders' Bank of Lynch-
burg, for $250.

The bill charges that after exhausting every means to collect
the collaterals in the possession of the Bank of Staunton, there
was a balance due by the Traders' Bank of Lynchburg of
$1,999.75 of principal, and $267.55 of interest, as of February
24, 1899, which will be wholly lost unless it can realize on the
notes endorsed by James Hancock.

It is charged that James Hancock holds title as trustee under
the fifth clause of the will of his father, the late A. G. Han-
cock, to a valuable house and lot situated on Main street, in the
city of Lynchburg, called the Traders' Bank building, now oc-
cupied by the National Bank of Lynchburg. The trust declared
by the will of A. G. Hancock is as follows:

"Item 5. I give and devise to my said son, James Hancock,
as trustee for his wife and children, including those now born
and all that may be born to him by his present, or any future
wife he may take, my store-house and lot on Main street, Lynch-
burg, on the west side, between Ninth and Tenth streets, now
occupied by M. E. Doyle, which I value at $14,000, to be held
in trust, not subject to his debts or liabilities, for the support
and maintenance of his present and any future wife he may take
and all his children, the said trust to continue during the life of
the said James Hancock, and if at his death he shall leave a wife
surviving him, until her death. Upon his death, if no wife sur-
vive him, or if one do survive him, upon her death, the said
property shall pass in fee simple absolute to all the children of
the said James Hancock in equal shares. The descendants of
any who now have died leaving descendants then surviving to
take the share of their deceased ancestor."

This will bears date April 17, 1888, and was recorded in the
clerk's office of the Corporation Court of Lynchburg on June 6,

1888. Those interested in the foregoing clause are Alice Hancock, wife of James Hancock, and certain infant children.

The bill states that the building at present on the lot was "erected during the year 1895 by the said James Hancock, and paid for by him with his individual funds, at which time Hancock was indebted as aforesaid on the notes held by your orator herewith filed, and your orator is advised that the said Hancock, being thus indebted, could not lawfully divert his own estate to the improvement of the trust estate as aforesaid and leave his indebtedness to your orator unpaid and unprovided for; that the money expended by Hancock out of his individual estate in improving the trust estate, being voluntary and without consideration, was in fraud of the rights of your orator, and that the estate can, in favor of your orator, be charged with the value of said improvements."

James Hancock, in his answer, denies that the present indebtedness of the Traders' Bank to the complainant, or that any part thereof, existed in 1895, and claims that only one of the respondent's notes ever came into the complainant's hands as collateral for the original debt. The answer denies the allegation that James Hancock expended money out of his individual estate in improving the trust property held under the will of his father, or that it was made in fraud of complainant's rights. His account of the transaction is that when the property was devised by his father it was valued at $14,000, with a storehouse which was rented out up to January 1, 1895; that during this period respondent had a good income from his own property and business, which was that of a leaf tobacco dealer; that he was able to maintain, and did maintain, his wife and children from his own means, and, as the store-house was old, and getting into bad condition, he determined to tear it down and erect a bank building on the trust property; that respondent owed the trust fund the sum of $602.30, with interest from November 5, 1888, and rents received from the trust property from

1888 to 1895, amounting to the sum of $5,765; that he erected the building under a contract with the Traders' Bank to rent it at an annual sum of $1,750; that it cost $9,100, and that since January 1, 1895, and prior to the institution of this suit, he had collected from the rents of said property the sum of $6,391.66, had paid the city taxes amounting to $408.90, and state taxes amounting to $109.08, so that the balance due respondent from the trust fund had been paid back to him in full.

Upon the issues thus made, and the proof in support of them, the judge of the Circuit Court, "being of opinion that the allegation of the bill that the moneys expended by the defendant, James Hancock, trustee, in improving the trust property, was of his individual estate, and voluntary and without consideration, is not sustained; but to the contrary, the evidence shows that the moneys belonging to the children, and the rents received from the trust property by said trustee constituted a valuable consideration for the expenditures made," dismissed the bill.

The case is before us upon an appeal from this decree.

There can be no doubt of the right of a creditor in a proper case to subject improvements made by his debtor on the property of another. This subject was recently considered by this court in *Building Association* v. *Reed*, 96 Va. 345, where the court, speaking through Judge Harrison, said: "D. V. Reed, having created the debts due to the appellants, could not thereafter lawfully divert his estate to the payment of purchase money due from his wife on her separate real estate, or to the cost of improving said real estate, leaving his own debts unpaid, and without the means of payment. It is well settled that improvements put upon the wife's separate realty by the husband, in fraud of creditors, can be followed by the creditors on the premises where they are put, and the realty can, in favor of the creditors, be charged with the value of such improvements. It would be contrary to the plainest principles of right and justice

to permit an insolvent husband to divert his means, and invest it in improving his wife's separate estate, which is not liable to his debts, and thus defeat the demands of his creditors."

Appellee insists, however, that, inasmuch as the notes with which it is now sought to charge the trust property were assigned to the Bank of Staunton after the erection of the building, appellant would have no right to attack the transaction even though it were conceded that Hancock had improved the trust property with his own funds, invoking for his protection the principle that "an assignment of a bare right to file a bill in equity for a fraud committed upon the assignor will be held void, as contrary to public policy, and as savoring of the character of maintenance."

It is true that a mere naked right to sue in equity to avoid a fraud is not assignable, but, as stated in 2 Am. & Eng. Ency. of Law (2d ed.), pp. 1024, 1025, this rule applies only to a case where the assignment does not carry anything which has itself a legal existence and value independent of the right to sue for a fraud. It does not apply to a case where such right is merely incidental to a subsisting substantial property which has been assigned, and which is itself intrinsically susceptible of legal enforcement. In such a case the assignee is entitled to maintain an action to set aside a fraudulent conveyance of the property assigned, if his assignor might have done so."

Waite on Fraudulent Conveyances (2d ed.), section 92, says "that the right to avoid a fraudulent conveyance is not personal to the then existing creditor. His successors and assigns may enforce the right. Thus the subsequent purchaser of a pre-existing note may attack a transfer. *Warren* v. *Williams*, 52 Me. 349; *Billingsley* v. *Clelland*, 41 W. Va. 234; *Schœfermann* v. *O'Brien*, 28 Md. 565.

2 Minor's Institutes, p. 690, treating of the right to avoid voluntary conveyances, says that the statute upon the subject protects persons suing *ex maleficio*, as for adultery or seduction,

or any tort, and *a fortiori*, those claiming *ex contractu*, as for a debt, or for breach of an official bond, and that whether as the original creditor or his assignee. *Clough* v. *Thompson*, 7 Gratt. 26; *Staton* v. *Pittman*, 11 Gratt. 102; *Shirley* v. *Long*, 6 Rand. 735.

This brings us to the consideration of the controlling question in the case: Does the record establish the allegation of the bill that Hancock, being at the time indebted, diverted his own estate to the improvement of the trust estate, in derogation of the right of his creditors?

It is true that a father, if of ability to do so, is bound to maintain his infant children, even though they may have property of their own. *Evans* v. *Pearce*, 15 Gratt. 515; *Griffith* v. *Bird*, 22 Gratt. 73. This principle is stated in Perry on Trusts as follows: "A father is bound to maintain his infant children if he has sufficient ability; therefore a trustee cannot apply any part of the income of an infant's estate to its maintenance without an order of court. If the father has the means to maintain his children, the trustee cannot apply income to their support, although there is a provision for their maintenance in the instrument." Section 612.

There seems, however, to be an exception or modification of this rule, which in the section just quoted from Perry is thus stated: "If there is an agreement in a marriage settlement that the father shall have maintenance out of the trust property, the trustee must apply the income to the support of the children without reference to the father's ability to support them. If, however, the trustees have a discretionary power in that respect, the father cannot compel them to exercise it in his favor; nor will the court interfere if they choose to exercise their discretion. But where the income is expressly given to the father for the maintenance of his children, these rules do not apply; for such gift is in some sort a gift to the father."

3 Pomeroy's Eq. Jur., in a note to section 1309, gives the

exception to the rule as follows: "Where the property is not given to the infants simply with a direction for their maintenance, but is conveyed upon an express trust for their maintenance, then it must be so applied, irrespective of their father's ability to support and educate them." This distinction is recognized in 2 Story's Eq. Jur., p. 600, note.

In a note to *Hughes* v. *Hughes,* 1 Brown Chan. 387, it is said that maintenance of infants is not allowed by courts where the parent is of ability, although directed by the will. In a note it is said that Lord Thurlow continued of this opinion for some time, and the precedents certainly supported him, but that afterwards he changed his opinion, and the practice became varied and was settled to the contrary. "It appears, therefore," says the annotator, "that each case must be viewed by the court so as to meet its exigencies by a sound discretion, unfettered by any strict rule of mere technicality; and that it will not only now allow maintenance for the time past, where it should be allowed at all, but will, in a fit case, direct maintenance, although the author of bounty may not have expressly prescribed it. The court will also dispense with any reference as to the father's ability, where the circumstances are strong; as where the fortune of the child is very large and the father has other children, or will be much inconvenienced by the burden of supporting the child adequately to a fortune in which he, the father, cannot participate."

In *Mundy* v. *Howe,* 4 Brown's Chan. 226, the Lord Chancellor said: "It is perfectly clear, from the cases, that where the fund is given as a bounty, notwithstanding a provision for maintenance, the father, if of ability, must maintain the child; (2) but in this case it is part of the execution of the trust contained in the contract."

In *Davey* v. *Ward,* 7 Chan. Div., Law Rep., 1877-'8, p. 754, a testator gave a legacy of £3,000 to three children, or the survivors or survivor, who should attain twenty-one; but if all

three died under twenty-one, there was a gift over. The will contained a direction to the trustees to apply the whole or such part as they should think fit of the income of the legacy for the maintenance and education of the legatees while under twenty-one. The court held that it had power to control the discretion of the trustees in the allowance to be made for children; and the court, in opposition to the trustees, directed that the whole income should be paid to the father of the children for their maintenance, together with an equal amount for past maintenance.

In *Ransom* v. *Burgess* (1866-'7), Law Reports, 3 Eq. 773, Vice-Chancellor Kindersley states the result of the cases to be "that where the trust property is derived from the bounty of a stranger, the father, if of sufficient ability, is not entitled to have the income applied to the maintenance of his children, but that if the trust property is the subject of a marriage settlement, and therefore the creation of the trust is matter of contract, then, if the language of the settlement is so framed as to express a trust to apply the income or any part of the income in maintaining the children, although the quantum of income to be so applied is left to the discretion of the trustees, the father is entitled to have whatever is proper and necessary for the maintenance of his children applied for that purpose, without reference to his ability to maintain them; but if the language of the settlement expresses merely a power so to apply the income, or any part thereof, to the maintenance of the children, then the father is not so entitled."

In *Hadow* v. *Hadow*, 16 Eng. Chan. 438, the testator gave one-third of his residuary estate to his wife, and the other two-thirds to trustees in trust for his children at twenty-one; and directed that, until the shares of his children should be payable to them, the income thereof should be paid to his wife, to be by her applied, or, in case of her death, to be applied by the trustees, for the maintenance of the children. It was held "that

the wife was entitled to the income of the children's share during their minorities, she maintaining them in a proper manner."

In *Browne* v. *Paul*, Eng. Chan., 1 Simon, New Series, p. 92, the testator gave all his property to trustees in trust, to pay an annuity to his wife, and subject to that payment, to convey, assign or transfer all his property, unto and equally between his children, when, and as they severally attained twenty-one; and, in the meantime, to pay to his wife, or otherwise apply the rents and proceeds of their respective shares for or towards their respective maintenance, education and advancement. It was held that "where, during the minority of a child, the interest of such child's legacy is directed to be paid to the parent, to be applied for or towards its maintenance, there the direction as to the application is a mere charge, for the benefit of the child, on what is, substantially, a gift to the parent subject to such charge."

These cases are not cited because of their similarity to the case under consideration, but as showing that the rule which requires a father to support his child is one which has been in later years greatly relaxed, and which depends in its application upon the circumstances of the particular case. As was said by Judge Robertson, in *Evans* v. *Pearce, supra*: "The court will look with liberality to the circumstances of each particular case, and to the respective estates of father and children, and will authorize the income arising from the estates of infants to be applied to their support whenever, under all the circumstances, it appears to be proper."

In *Griffith* v. *Bird, supra,* the court held that where a father, who was the guardian of two of his children, maintained and educated them at his own expense and made no charge against them, and died in February, 1861, up to which time his estate was ample to pay his debts, but became insufficient to do so by losses incurred thereafter, that between the father and his

creditors his child would not be charged in the guardianship account with the cost of their maintenance and education.

The financial condition of James Hancock at his father's death does not appear. The trust property vested in him as trustee, under the fifth clause of his father's will, for the support of his wife and children, passed at once under his control. He collected the rents, commingled them with his own funds, rendered no account, and in January, 1895, claims that he was indebted to that fund in the sum of $5,765.85, which, if true, proves that he had, during that period, appropriated that much of the rents derived from the trust property to his own use, in violation of the terms of the trust which had been reposed in him. Is that true? Had there been during that period any diversion by the trustee of the trust fund confided to his care? The house, valued at $14,000, was devised to him by his father as trustee for his wife and children, to be held not subject to his own debts or liabilities, but in trust for the support and maintenance of his present or any future wife that he may take, and his children, the said trust to continue during the life of James Hancock; and if, at his death, he shall leave a wife surviving him, until her death. Upon the death of James Hancock and wife, the trust was to cease, and the property to vest in fee simple absolute in all of his children in equal shares. His claim now is that in 1895 he was indebted to the trust fund, because it was his duty to support his children; that he was of ability to do so, and that he was guilty of a breach of trust in appropriating the trust property in part discharge of the duty which the law had imposed upon him. If the will of A. G. Hancock had merely conferred a power upon the son as trustee, so to apply the rents and profits of the trust property, it would be a most dangerous precedent, in our opinion, to allow him, after he had exercised that power and appropriated the rents of the trust property to the maintenance and support of his wife and children, to recall the exercise of the discretion

with which he had been invested, and permit him to reconstruct the past as between himself and the trust fund and his beneficiaries, and after a lapse of eight years to constitute himself a debtor to the fund which had been confided to his control. If, we repeat, the will had clothed him with the exercise of a mere power, and that power had been exercised in accordance with its terms, the court would be slow to reopen the transaction and restate the account, for to do so would be to multiply opportunities for fraud and imposition upon innocent creditors. But in the case before us the trustee was not clothed with a mere discretionary power. He received the property impressed with a trust for the support of his wife and children. Its income seems to have been applied during all these years in strict conformity with his duty as prescribed by his father's will, and where is the wrong and injustice of which his beneficiaries can now be heard to complain?

This house and lot, which is the subject of the trust, was, at the date of the testator's death, rented for the sum of $900. By reason of the improvements which have been placed upon it under the circumstances which have been detailed, a contract for its rental was entered into before its erection at the sum of $1,750 per year. Its yearly value had been increased more than 90 per cent.

The conduct of the trustee in this case was well calculated to beguile and mislead those who dealt with him. Had he settled his accounts, and charged himself with the accumulation of rents from the trust property, all who extended credit to him would have done so with their eyes open; but there was nothing to disclose the true condition of his affairs, and much to lull them into a false security. He not only stated no account, but for all that appears he kept none. He commingled what he received from the trust with his own money, and drew upon it as a common fund.

A trustee cannot, of course, by such conduct prejudice the

trust, but the question here is whether he shall defeat his creditors, not for the protection of the trust from loss, but its augmentation by the process of capitalizing the rents derived from it. Equity enjoins upon us the duty of being just before we are generous. As we have seen, if the trustees have discretion as to the application of the fund to the support of the children, the court will not, at the father's instance, compel them to exercise it, he being of ability. Nor will the court interfere with their discretion if they see fit to exercise it. 2 Perry, section 612. So, by parity of reasoning, where the trustee has exercised the discretion and supported the children, the father will not be permitted to restore to the trust fund what had been rightfully appropriated in order that he may augment the trust fund and evade the payment of his honest debts, for that would be to make the rights of men depend not upon law, but the whim, the caprice, the preference, or the interest of the individual.

If the will is to be construed as not clothing the trustee with a mere discretion, but as creating an express trust for the support of the wife and children, which we think is the true construction, then the case is still stronger for appellant, for then it must be so applied irrespective of their father's ability to support and educate them. 3 Pom. Eq., *supra*. Either view is conclusive of the case, for if such be the law where there is a discretionary power or an express trust in cases in which the father is not the trustee, the union of the two relations in one person can have no influence upon the result.

The case of *Norris* v. *Jones*, 93 Va. 176, seems to be relied upon by appellees. An insolvent son had made a gift to his mother, and a creditor, whose debt arose prior to the gift, brought a suit to hold the mother liable for its payment, and to subject the gift to the payment of his debt, but it appearing that prior to the institution of the suit the mother lent the son an amount larger than the gift, that there was no actual fraud.

and that the mother had no knowledge of the insolvency of the son, the court held that there was no liability upon her. It could not have been otherwise. There was no actual fraud. There had been a restoration to the son's estate by the mother of what she had received. The ability of the son to meet his obligations had not been diminished, and the creditor in no respect prejudiced by the transaction.

We are of opinion that to sanction what was done in this case would be to permit a trustee to change his course of conduct in the light of subsequent events, and of his altered financial condition, and to permit him to simulate a debt to the estate under his control in order that it might be augmented for the benefit of his wife and children at the expense of existing creditors.

The decree of the Circuit Court must be reversed.

*Reversed.*