#### OF THE

## STATE OF ARIZONA

### FROM MAY 14, 1914, TO APRIL 12, 1915.

---

[Civil No. 1365. Filed May 14, 1914.]

[140 Pac. 825.]

In the Matter of the Guardianship of the Person and Estate
of EMMA J. HARRIS, a Minor. EMMA J. HARRIS,
by Her Guardian *Ad Litem*, Appellant, v. WILLIAM H.
LYON, Guardian, Appellee.

1. PARENT AND CHILD—DUTY OF PARENT—CARE OF CHILD.—A parent is
   required to care for his child during the time it is unable to care for
   itself, and is entitled to use the child's estate for that purpose only
   in exceptional cases.

   [As to obligation of parent to support child, see note in 64 Am.
   Dec. 279.]

2. PARENT AND CHILD—PERSONS IN LOCO PARENTIS—STEPFATHER.—
   While a stepfather was under no natural or legal obligation to care
   for a minor stepchild, the assumption of that duty by the stepfather
   carried with it the resulting legal responsibilities.

3. PARENT AND CHILD—SUPPORT OF CHILD—RECOVERY BY PARENT.—A
   parent or one *in loco parentis*, such as a stepfather, who advances
   money to support the child, cannot, years thereafter, recover such
   expenditures as upon an implied contract by the child to repay them.

   [As to claim of parent or one standing *in loco parentis* for sup-
   porting child, see note in 58 Am. Dec. 226.]

4. GUARDIAN AND WARD—SETTLEMENT—PROCEEDINGS—SUFFICIENCY OF
   EVIDENCE.—In proceedings for the settlement of the account of a
   guardian, who was the ward's stepfather, evidence *held* to show that
   the guardian expected no remuneration from the child for expendi-
   tures made for her support, etc.

XVI Ariz.—1                    (1)

5. PARENT AND CHILD—SUPPORT OF CHILD.—The intention of one *in loco parentis,* such as a stepfather, to require repayment of amounts advanced for. the maintenance, etc., of a stepchild must be shown in order to entitle the stepfather to repayment, as otherwise the maintenance will be deemed gratuitous.

6. HOMESTEAD—SALE FOR DEBTS—TIME OF CONTRACTING.—Under Revised Statutes, section 2296 (U. S. Comp. Stats. 1901, p. 1398), providing that no land acquired under the chapter, which relates to the entry of public land as a homestead, shall in any event become liable for debts contracted prior to the issuing of the patent, the land cannot be sold for debts of the heir of an entryman contracted before issuance of patent.

APPEAL from a judgment of the Superior Court of the County of Yuma. Frank Baxter, Judge. Reversed with directions.

The facts are stated in the opinion.

Mrs. Mary A. Wupperman, for Appellant.

Mr. Thos. D. Molloy, for Appellee.

ROSS, J.—Appeal from an order of allowance and settlement of guardian's account and from an order authorizing and directing the guardian to sell real estate of the ward. In 1906 the appellee married May Harris, the mother of Emma J. Harris who was then about ten years old. The mother, May Harris Lyon, died June or July 17, 1907, leaving no estate. From that time on Emma Harris lived with her grandmother, Mrs. Lena White, who was the mother of May Harris Lyon. The appellee, stepfather to Emma, was a party to an arrangement that she should live with her grandmother, he to furnish her housing, clothing, food and medical attention and generally to provide for them. While perhaps there was no definite agreement in terms to such an arrangement, the subsequent conduct was along those lines. The appellee made provision for the grandmother and minor in this manner from June 17, 1907, until March 11, 1912, simply as the stepfather to Emma. On the last-mentioned date he secured letters of guardianship of both the person and estate of the minor, but continued the arrangements, with slight

interruptions, as to her care and keep as before. The estate of which he was appointed guardian consists of one hundred and sixty acres of land in Yuma county, filed upon by May Harris under the federal homestead law October 28, 1903, before her marriage to appellee. After the death of entrywoman, appellee continued to improve and cultivate the land to comply with the homestead act, and in course of time made final proof. The final receipt was issued by the government March 10, 1913, and in June, 1913, a patent was issued to the heirs of entrywoman. The appellee prefaced his account against the minor, Emma Harris, as follows: "That since the death of the mother of said minor, May Lyons, on June 17, 1907, affiant has, out of his own funds, cared for and maintained said minor, she not having any estate or income whatsoever, except her prospective interest in said land (homestead) which until this time has always been uncertain, remote and practically valueless. That in such care and maintenance affiant has expended the following sums." The statement shows an expenditure from June 17, 1907, to April 1, 1913, for care and maintenance of $5,300, and moneys paid out improving and cultivating homestead, final proof, fees, commissions and attorney's fees, court costs, in the sum of $680, two-thirds of which is charged to minor, and $20 paid clerk of court, making $473.33, or all told $5,773.33. This account of appellee was contested by the guardian *ad litem* as being: (1) Excessive and fraudulent; (2) on the ground that all advances for the care and maintenance of Emma were made by appellee voluntarily; and (3) that appellee was the stepfather of Emma, and as such exercised all the rights of a natural parent, and thereby assumed all the duties and obligations of a natural parent; (4) that the account of guardian was barred by the three-year statute of limitation; and (5) that all items charged against the minor before letters of guardianship were issued should be disallowed for the reason that the minor is not liable for any expenditures made by her stepfather prior to his appointment as guardian. The court overruled the legal questions raised by guardian *ad litem,* heard evidence in support of and against the account, and rendered judgment allowing the account of appellee for care and maintenance in the sum of $2,780, or $40 per month from June 17, 1907, to April 1, 1913, and for improving and pre-

serving the homestead the sum of $585, or a total sum of $3,365. Both parties appeal from this judgment, appellee contending that allowance is too small, and appellant that it was far too much.

The law imposes upon the parent the duty of caring for his child during the period of its inability to care for itself, and only in exceptional cases may he use the estate of the latter for that purpose. In this case the minor, Emma Harris, after her mother's death, was left without parents and without any available or tangible estate. She was but ten years old and of delicate constitution. The appellee, either because of his being the husband of her mother and therefore the child's stepfather, or out of sympathy for her in her helpless condition, or both, without any legal obligation to do so, undertook to care for her out of his own means. Without letters of guardianship, he provided for her and her grandmother, furnishing them the ordinary and necessary comforts of life from June 17, 1907, until March 11, 1912.

While appellee was under no natural, and therefore no legal, obligation to care for the minor child, the assumption of that duty by him carried with it legal responsibilities.

As is said in the note to *National Valley Bank* v. *Hancock*, 57 L. R. A. 729 (100 Va. 101, 93 Am. St. Rep. 933, 40 S. E. 611) : "The universal rule is that a stepfather, as such, is not under obligation to support the children of his wife by a former husband, but that, if he takes the children into his family or under his care in such a way that he places himself *in loco parentis*, he assumes an obligation to support them, and acquires a correlative right to their services."

In *Sharp* v. *Cropsey*, 11 Barb. (N. Y.) 224, it is said: "The stepfather is not bound to support his stepchildren, nor the latter to render him any services; but if he maintains them, or they labor for him, they will be deemed to have dealt with each other in the character of parent and child, and not as strangers, without obligation on the part of the father to pay for his children's services, or on the part of the children to remunerate their father for their support." See *National Valley Bank* v. *Hancock, supra,* and *Bartley* v. *Richtmyer,* 53 Am. Dec. 338 (4 N. Y. 38), for collection of cases on this point.

The record shows that the appellee claimed the right to the custody of Emma from the time of her mother's death, and that he first placed her with one of his own blood relatives; that she was left with her grandmother in obedience to a request of his wife before her death; that the grandmother's position was that of housekeeper, largely subject to the orders and directions of the appellee; that he furnished the house for them to live in, much of the time retaining a room for his personal use; that he exercised the parental rights of controlling and supervising the conduct, education and employment of Emma, and at one time corporally chastised her for disobedience. Practically the only surrender made by appellee was in the matter of Emma's religious training, in which he deferred to the expressed wishes of his deceased wife and the wishes of the grandmother. The rights, powers and duties claimed and exercised by him over the child were such as only a parent could lawfully claim and exercise. Indeed, in his petition to the court for authority to sell the homestead, dated and sworn to by appellee March 12, 1913, he describes Emma as follows: "That said minor is the only daughter of one May Lyon, now deceased, and the *stepdaughter of her guardian, William H. Lyon.*" The law will not permit a parent or one *in loco parentis,* years after he has made advances to the child for its support, to recover his expenditures as upon an implied contract. Here the duty was voluntarily assumed, and voluntarily the obligation was discharged. Moreover, it fairly appears that appellee never expected to be remunerated when he first took charge of the child and for quite a while thereafter, for in his first account against his ward, dated March 17, 1913, he states that he "has, out of his own funds, cared for and maintained said minor, she not having any estate or income whatsoever, except her prospective interest in land, which *until this time* has always been *uncertain, remote, and practically valueless.*" Indeed, the thought of repayment of his outlays for the child seems to have germinated coincidently with or shortly before she secured title to the homestead, theretofore considered "uncertain, remote and practically valueless," but, as shown by the inventory and appraisement, of the real value of $85 per acre.

That the appellee kept no books of account between himself and the child and had no record of the items, nor the dates when furnished, and in making up his account was compelled to resort to the memory and books of the various tradespeople with whom he had had accounts, are strong circumstances indicating an absence of intention at the time to ask for reimbursement. That for a long time he expected no remuneration is shown by his own testimony in which he said:

"A. When Emma's mother first died there wasn't any property except that piece of land on the Mesa, and I didn't think it was worth anything at all, and lots of times I called in Ap John and didn't think about getting a receipt. I paid him and kept no record of it. I paid very little attention to it because I didn't think there was anything in the Mesa land.

"Q. When did you first have any assurance you would get anything out of the Mesa land?

"A. I first began to believe that the property might be of value in 1909 or 1910.

"Q. As to getting the title, when did you begin to have hopes of getting title to it?

"A. About a year ago."

The intention or purpose to require repayment is essential (*In re Tucker,* 74 Mo. App. 331, 337); otherwise the support will be considered voluntary and gratuitous.

The appellee relies upon *In re Besondy,* 32 Minn. 385, 50 Am. Rep. 579, 20 N. W. 366, to support his contention that he is entitled to reimbursement. In this case the stepchild's estate consisted of $1,138.40 cash, and it was expressly arranged between the stepfather and mother that the child should live with them and be supported as one of the family, and that the estate money should be applied and used in payment therefor. The court said: "The arrangement made by the stepfather, though invalid as a contract, is sufficient to rebut the presumption that he took the child into his family to support *in loco parentis,* and on account of his tender years he could render no service in return for such support. . . . And a stepfather is, of course, not bound to maintain the children of his wife by a former husband. But if he voluntarily assumes the parental relation and receives them into

his family under circumstances such as to raise a presumption that he has undertaken to support them gratuitously, he cannot afterward claim compensation for their support.'' The account was allowed, because, the court said, ''It is quite clear that they [mother and stepfather] furnished such support under the circumstances with the expectation of being reimbursed out of his [the child's] income, and not as a gratuity.'' The decision turned on the intention formed at the time the support was given, and the added fact that the infant was at the time the owner and possessor of an estate in cash available for his present care and maintenance.

To the same point appellee cites *In re Beisel's Estate,* 110 Cal. 267, 40 Pac. 961, 42 Pac. 819, and says: ''In view of the fact that we have the same statute on guardian and ward· as the state of California, we regard, and urge upon this court, the case of Beisel as the most persuasive authority.'' In this case the mother was allowed for the maintenance of her minor children for over five years before she was appointed their. guardian. However, their estate, consisting of $4,007 and some realty, was in the possession and control of the mother during all that time. The court said: ''Appellant contends that there was no warrant for an allowance by way of credit to Mrs. Sherrer for maintenance of the minor children during the time when there were no letters of guardianship upon their estates. But she is charged in equity as a *quasi* guardian or trustee of their estates, and the accounting must be deemed in the nature of an accounting in equity, and determined upon equitable principles. The court finds in substance that the action of Mrs. Sherrer, as the mother of the children, was *bona fide;* and it had jurisdiction to allow reasonable and proper credits to her for their maintenance and for expenditures incurred on their account. A guardian *de facto,* who is not a guardian *de jure,* will be held to account in equity only upon equitable principles, and will be allowed for all proper disbursements for the benefit of the ward. *Peale's Admr.* v. *Thurmond,* 77 Va. 756. 'The rule is that where an infant has property of his own, and his father is dead, or. is not able to support him, he may be maintained and educated out of the income of property absolutely his own, by the person in whose hands the property is held; and a court of equity will allow all payments made for this pur-

pose which appear upon investigation to have been reasonable and proper.' Schouler, Dom. Rel., sec. 238. Where the income is insufficient for the maintenance and education of a child, equity will break into the principal. *Barlow* v. *Grant,* 1 Vern. 255; *Bridge* v. *Brown,* 2 Younge & C., c. 181; *Ex parte Green,* 1 Jac. & W. 253; *Newport* v. *Cook,* 2 Ashm. [Pa.] 332; *Osborne* v. *Van Horn,* 2 Fla. 360. A mother will be allowed in equity for the past maintenance of her children, from the death of the father, out of the estate of the children, though she has a separate estate. *Wilkes* v. *Rogers,* 6 Johns. [N. Y.] 567, 589, 593; *Gladding* v. *Follett,* 2 Dem. Sur. [N. Y.] 68; *Aynsworth* v. *Pratchett,* 13 Ves. 320; *In re Besondy,* 32 Minn. 385, 20 N. W. 366 [50 Am. Rep. 579] ; *Osborne* v. *Van Horn,* 2 Fla. 360. The criterion for determining whether a past maintenance should be allowed is whether a chancery court would have authorized it in advance. *Alston* v. *Alston,* 34 Ala. 27.'' In the Beisel case and cases cited therein it will be observed that an estate existed at the time support was given the minor, and that the relation of trustee and *cestui que trust* was present. Take the criterion given in the Alston case, *supra,* and, endeavor ever so hard, it cannot be applied to the present case. Upon the death of the entry-woman, May Harris Lyon, the surviving child, Emma Harris, had only an inchoate right in the homestead, and neither this remote interest, nor the perfected title, under the law, could be subjected to the payment of any debt contracted for support, or on any other account, before title was obtained. No court of chancery would have done the futile thing of entering an order authorizing the appellee to maintain and support the minor child, Emma Harris, with the hope or expectation of being remunerated out of the homestead.

Under the peculiar facts of this case we are satisfied that the trial court committed error in allowing and settling the appellee's accounts for the care and maintenance of Emma Harris prior to letters of guardianship.

The petition for authority to sell the homestead represents that the land is unproductive, and that it is necessary that the same be sold in order to realize money with which to pay off the appellee's allowed claim of $3,365 and to care for the future education and support of the minor. The order ap-

pealed from directing the sale of the homestead is based upon the reasons assigned in the petition. This order involves the question as to whether the homestead may be subjected to the payment of debts contracted by the minor, before patent was issued to the heirs of the original entrywoman. If not, the order authorizing the sale for that purpose is in error. The entrywoman, May Harris, filed on the land in October, 1903. She became the wife of appellee in 1906, and died in 1907, before the required residence, improvement and cultivation were complete, and before she was entitled to a patent. The appellee, after the death of entrywoman, performed the necessary acts of improvement and cultivation, made final proof, and in June, 1913, a patent to the land was issued to the heirs of the deceased entrywoman under the provisions of sections 2291 and 2292, Revised Statutes of the United States (U. S. Comp. Stats. 1901, pp. 1390, 1394, 6 Fed. Stats. Ann., pp. 292, 303). Section 2296, *Id.* (U. S. Comp. Stats., p. 1398, 6 Fed. Stats. Ann., p. 307), provides that: "No lands acquired under the provisions of this chapter shall in any event become liable to the satisfaction of any debt contracted prior to the issuing of the patent therefor."

The courts have many times passed upon this section, holding that the antecedent debts of the entryman cannot be collected out of the homestead against the will and consent of the entryman. *Sprinkle* v. *West,* 62 Wash. 587, Ann. Cas. 1912D, 281, 34 L. R. A. (N. S.) 404, 114 Pac. 430; *Sorrels* v. *Self,* 43 Ark. 451; *Towner* v. *Rodogab,* 33 Wash. 153, 99 Am. St. Rep. 936, 74 Pac. 50. While the right of the heir to claim the same exemption from debts contracted by him prior to the issuance of patent has not been before the courts so often, there is the same uniformity in the decisions to the effect that the heir takes the land free from his antecedent debts.

In *Coleman* v. *McCormick,* 37 Minn. 179, 33 N. W. 556, the original entrywoman devised the land to her brother, to whom patent was issued. The question was as to whether a debt contracted by patentee before the patent was issued to him as such devisee under the provisions of section 2291, Revised Statutes of the United States, could be enforced as against the land. That court said: "The statute provides specifically for the acquisition of a patent by the homestead

settler, or, in case of his death, by his widow, or, she having died, by his heirs or devisee, or, in case the entry is by a widow, then, upon her death, by her heirs or devisee. Bearing in mind the specific provision thus made, empowering these different classes of persons to secure the title under this law, it is difficult to construe the unqualified language of the exemption as being applicable to one of the specified classes, but not to the others. It is, of course, effectual as to the original homestead settler. There would seem, too, to be no doubt of its applicability, where the widow of the settler, or, she dying, his minor children, the members of his family, perfect the title in themselves, so that they would hold the land free from liability for any prior debts which they might have contracted. Such cases are clearly within the beneficent purpose of the homestead law, and within the terms of the section declaring the exemption. It may be said that the law was not framed for the . . . remote heirs of the homestead settler, not members of his family, and not dependent upon him for support, nor for the benefit of devisees not of kin to the testator, and that therefore the exemption does not attend the title acquired by such persons. But it is impossible by any process of judicial construction to determine that the exemption, which in terms is applicable to heirs and devisees without distinction, was intended to apply only in favor of certain heirs or devisees, and was not applicable as to others. The statute affords no indication that any distinction is to be made, nor anything by which a court could be guided in declaring what patentees under this law are within the exemption, and what are not. Such distinctions can only be made arbitrarily, and this would not be construction, but legislation." *Gould* v. *Tucker,* 20 S. D. 226, 105 N. W. 624.

It follows that the court erred in ordering the Emma Harris homestead interest to be sold to pay debts contracted by her prior to the issuance of the patent.

On a new trial, the court should disallow the appellee's claim for care and maintenance and money laid out in cultivating and improving land, attorneys and in fact all expenditures prior to his appointment as guardian. The appellee should be allowed all necessary expenditures since his appointment as guardian that have been made for the support of his ward or the protection of her rights in homestead. Should

another order authorizing the guardian to sell her homestead interest be made, it should be made to appear that such sale is necessary in order to secure ready means for the support and education of the ward and the payment of the guardian's account for necessary expenditures for her support incurred since the issuance of patent to homestead.

Judgment is reversed, with directions to proceed in accordance with this opinion.

FRANKLIN, C. J., and CUNNINGHAM, J., concur.

Application for rehearing denied.

NOTE.—On the question of the parent's duty to support as affected by child's property interests, see note in 57 L. R. A. 729.

As to the right of a parent to sue child for support, see note in 4 L. R. A. (N. S.) 1159.

As to the liability of claim or interest in public lands for debts contracted before issuance of patent, see note in 34 L. R. A. (N. S.) 405.