Submitted July 1, reversed November 12, 1959

IN THE MATTER OF ROGER PAUL MURPHY, ALLEGED
A DEPENDENT CHILD
BELMONT *v.* BLACK ET AL
346 P. 2d 367

Tanner & Carney and Tolbert H. McCarroll, Portland, for appellants.

LUSK, J.

This is an appeal from an order of the circuit court declaring Roger Paul Murphy, a minor child, to be "a dependent ward of the Clackamas County Juvenile Court." The proceeding was commenced by a petition filed by Perry O. Belmont on December 26,

1958, with the Juvenile Department of the Circuit Court for Clackamas County, alleging that Roger Murphy, a minor, is a dependent child in that he is. "without parental care." On January 15, 1959, the court entered an order declaring the minor to be "a temporary dependent ward of the Clackamas County Juvenile Court," and ordering that he be "placed under the temporary care, custody and supervision of the Clackamas County Juvenile Counselor pending further investigation and until further order of the court." On January 21, 1959, Otto E. Black, the appellant, filed a motion for an order vacating the order of January 15, 1959, on the ground that it was entered without any notice or opportunity to be heard by the said Otto E. Black, and deprived him of said child without due process of law. An affidavit in support of the motion, executed by Black, stated in substance that on April 4, 1956, he had married Theda Murphy, the mother of Roger; that prior to their marriage he had covenanted with Theda Murphy to provide for the support of Roger, who was then six years of age, and whose father had died in April, 1953; that on November 5, 1957, the affiant's wife was killed in an automobile accident, and ever since then as well as before he had faithfully kept his promise to provide for the boy "in the same manner as if said boy were my own flesh and blood."

No order was ever entered upon this motion, but on January 23, 1959, citation was issued to Royda Cole and Lee Cole, a half-sister and brother-in-law of Roger, and with whom the boy was living at the time, to appear and show cause why he should not be declared a dependent child. On February 4, 1959, a hearing was held at which Otto E. Black and Perry O. Belmont appeared and were represented by counsel,

and the State of Oregon was represented by a deputy district attorney for Clackamas County.

In the meantime, Perry O. Belmont, who was a brother of the minor's father, had filed a petition to be appointed guardian of the person and estate of Roger, and Otto E. Black had filed a petition that he be appointed such guardian. Royda Cole joined in the latter petition, and in the alternative asked that if it should be denied she herself be appointed guardian.[1]

All these matters were considered by the court at the hearing. At its conclusion, the judge rendered an oral opinion in which he stated that he felt that the boy needed the court's supervision to assure that he was properly cared for, although he did not mean to infer that he had been improperly cared for up to that point. The judge repeated, "I find no fault with the manner in which the child is being cared for at this point," but he thought that "the youngster this age needs the security and affection of a home in which a close relative is supervising, particularly a youngster who has gone through the traumatic experiences that he has had, the loss of both parents." The court denied the petitions for appointment of a guardian of the person of the minor, but appointed Mrs. Cole guardian of his estate and directed that until further order of the court the boy should remain in the home of Mr. and Mrs. Cole as agents of the court. As above stated, this appeal is from the order adjudging Roger Paul to be a dependent child. The guardianship matter is not before us.

---

[1] Several relatives of the minor child on his mother's side filed pleadings in which they joined in the petition of Otto E. Black to be appointed guardian, and objected to the appointment of Perry Belmont. These parties all filed an acceptance of service of notice of appeal and a joinder in the appeal. Whether they are proper parties here need not be determined.

The only appearance in this court is by brief on behalf of Otto E. Black, Royda Cole and the other relatives above referred to. The district attorney of Clackamas County has advised the clerk of this court by letter that his office "has no interest in this matter, and does not intend to file a brief." Why he has lost his interest does not appear.

In 1956, Otto E. Black married the widowed mother of the minor, Roger Paul Murphy, who was then six years of age. Mrs. Black was killed in an automobile accident in November, 1957, and ever since then Black has acted as the boy's father. He is a bus driver for the Greyhound Lines and, being unable on account of his occupation to maintain a home for the boy, arranged for him to live in the home of Mrs. Royda Cole, Roger's married half-sister. Each month, Black receives from the United States government for Roger's benefit a Social Security payment, the amount of which at first was $73.00, and was later increased to $78.90. Of this, he has been paying $50.00 a month to Mrs. Cole for keeping Roger in her home, and the balance he has expended, according to his testimony, for other necessaries for the boy, such as clothes and medical and dental expenses.

There is no suggestion in the record that Roger has not been properly cared for in a good home. Obviously, the trial judge so determined, for he ordered the boy to be left there. All the testimony on the subject demonstrates the existence of a strong bond of affection between Roger and his stepfather. There was no attempt to show anything to the contrary. Mr. Black spends all the time with Roger that his employment will permit. Mrs. Cole, who is the mother of two children, testified:

"He loves Ed and Ed loves him. He has

accepted Ed as his father just the same as I accepted my step-dad as my real father. To me it's very plain to see. I know it isn't for other people, but Roger loves Ed more than anything and he has the feeling that Ed married Mama because he loved her, but he also married Mama because he loved Roger. He would never have married her if he didn't want to have Roger, too, because he knew, of course, that Roger was part of the family and he has accepted the fact and Roger has accepted the fact, and Roger loves him very much, and it would hurt him very, very deeply if he should ever have to be taken away from Ed. * * * ."

There is not only no direct contradiction of this testimony, but there is nothing in the entire record which gives any reason for questioning it.

Mr. Black is 34 years old. He has been a bus driver for Greyhound Lines for 8½ years. In 1957 his wages were $5,600.00; for 1958, he thought that they would be between $4,800.00 and $5,000.00.

It was brought out in the testimony that Black is a divorced man and has a daughter by his former wife, who has remarried and now lives in Yakima, Washington, and that at the time of the hearing he was apparently delinquent three months in the payment of support money to his former wife as ordered by the court. It was also shown that he had kept no track of his expenditures of the Social Security money over and above the $50.00 a month which he paid to Mrs. Cole. Further, there was some evidence that he was considering at one time moving to California, but he testified, and we have no reason to disbelieve him, that he had abandoned that idea.

In our judgment, Mr. Black's delinquencies in not fully complying with the court's order for the support of his daughter by his former marriage and his

failure to keep account of his expenditures of the Social Security moneys are not, in view of all the evidence, sufficiently grave faults to justify holding that Roger is not receiving parental care. He testified generally that the amounts expended exceeded the receipts. And we need not decide whether the court would be warranted in interfering if it had been established that Black was about to take the boy to another jurisdiction. We should suppose that, unless it appeared that such a move constituted an immediate threat to the boy's welfare, the statute could not be properly invoked to prevent the exercise of the right of a citizen of this country to move from one place to another. But we pass the question, as we think that the evidence shows that Black intends to remain in this state.

■ The measure of the court's authority in this kind of a case is to be found in the statute. *State v. Young,* 180 Or 187, 194, 174 P2d 189. The procedure, and the extent of the court's jurisdiction, are set forth in ORS 419.102 and 419.502 to 419.522. Child dependency is defined in ORS 419.102. It includes "persons of either sex under the age of 18 years" who "have not parental care or guardianship." This is the only part of the statute applicable to this case, because want of "parental care" is the only respect in which the petition of Perry O. Belmont alleges that Roger Paul Murphy is a dependent child. We observe in passing, however, that there is no evidence that he is a dependent child within any other definition of the term contained in the statute. The entire section is set out in the margin.[2]

---

[2] 419.102. (1) "Child dependency" is defined as follows:
(a) Persons of either sex under the age of 18 years, who for any

It is obvious that the legislature did not intend that children without parents or guardians should be declared dependent for that reason alone, for the statute impliedly recognizes that children in the care and custody of others than their parents or guardians are not to be deemed dependent unless the particular conditions set forth are found to exist, as, for example, the case of a child "whose home by reason of neglect, cruelty, drunkenness, or depravity on the part of parents, guardians, or *other persons in whose care they may be,* is an unfit place for such children." (Italics added.) This court has recognized that within the meaning of this statute "parental care" may be provided by persons who are not parents or guardians, and that children receiving such care are not dependent. *State v. Young,* supra, 180 Or at 194; *In re Schein,* 156 Or 661, 665, 69 P2d 293.

The "parental care" of which the statute speaks is the kind of care to be expected of a good father and mother. Without attempting a comprehensive definition, it may be said that the phrase includes, of course, providing for the material needs of their children in accordance with the family's station in

reason are destitute, homeless, or abandoned; or are dependent upon the public for support; or have not parental care or guardianship; or who are found begging or gathering alms; or are found living with any vicious or disreputable persons; or whose home by reason of neglect, cruelty, drunkenness, or depravity on the part of parents, guardians, or other persons in whose care they may be is an unfit place for such children; any persons under 14 years of age who are found peddling or selling any article, except as permitted under special child labor regulations; or persons under 14 years of age who are found playing musical instruments upon the streets to induce the giving of gratuities, or who accompany or are used in aid of adult persons in so doing, shall be classed as dependent children.

(b) Persons of either sex under 18 years of age whose parents or guardians neglect or willfully fail to provide for them; or allow them to have vicious associates, or to visit vicious places; or fail to exercise proper parental discipline and control over them are classed as neglected children.

(2) Courts and other public officers shall labor with the parents or guardians of such children, and if possible induce them to perform their neglected duties. Subsequent to suitable efforts to compel the parents or guardians to rectify said neglect, and in event of the failure of such efforts, neglected children shall be classed as dependents.

life, seeing to it that they receive at least a minimum of schooling, and, by example and proper measures of discipline, so ordering their lives that they may grow up to become good citizens and useful members of society. Certainly, the statute was not intended to authorize a court to interfere with an established family relationship, in all respects wholesome and beneficial, simply because it might be thought that a child's welfare would be better served by giving the custody and control of it to some one else. *Bryant et al v. Brown,* 151 Miss 398, 118 So 184, 60 ALR 1325.

■ In our opinion, the statute may properly be invoked only in cases where the child needs the protection of the state as *parens patriae,* and this always with due regard to the constitutional precept thus stated in *Pierce v. Society of Sisters,* 268 US 510, 69 LEd 1070, 45 SCt 571, 39 ALR 468:

"The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." (268 US at 535.)

■ In this case, we think that Mr. Black is properly to be regarded as the parent of Roger.

The word "parent", as used in many statutes, is not construed to include a stepfather or stepmother. *In re Bishop,* 26 F2d 148, 149; *In re Remske,* 160 NYSup 715, 716; *State ex rel Sheedy v. District Court,* 66 Mont 427, 213 P 802, 804; *Niosi v. Aiello,* 69 A2d 57, 61; *Boudreaux v. Texas & N. O. R. Co.,* 78 SW2d 641, 643; *Marshall v. Macon Lumber Co.,* 103 Ga 725, 30 SE 571, 572; *State v. Barger,* 14 Ohio App 127. As stated by Judge Nordbye in *Miller v. United States,* 123 F2d 715, 717 (CCA 8th): "A stepfather

does not merely by * * * such relationship stand in loco parentis to the stepchild. * * * The assumption of the relationship is a question of intention." Where, however, the relationship has been assumed, the courts have held a step-parent to be a parent within the meaning of the word as used in a policy of insurance (*Sov. Camp W.O.W. v. Cole,* 124 Miss 299, 86 So 802; *Jones v. Mangan,* 151 Wisc 215, 138 NW 618; *Golden v. United States,* 91 FSup 950); a compensation act (*Faber v. Industrial Com.,* 352 Ill 115, 185 NE 255); a statute providing that a parent may discipline his child (*Snowden v. State,* 12 Tex App 105); and even a statute defining a crime (*Miller v. United States,* supra). See, also, *Furgeson v. Jones,* 17 Or 204, 214, 20 P 842, 11 AmStRep 808, 3 LRA 620.

Closely in point is *State ex rel Williams v. Juvenile Court,* 163 Minn 312, 204 NW 21, where the question was whether a nine-year-old girl should be adjudged a dependent. There a stepmother had, as the court said, "voluntarily and definitely placed herself in loco parentis" to a child whose father was serving an indeterminate prison sentence in another state. The court found that she had assumed the duties of motherhood as fully with respect to the little girl as to her own children, and that she was trying to keep the family intact pending the father's return to them. The opinion proceeded:

"It is needless to say that it would be a cruel and inadvisable thing for government to thwart such an endeavor by seizing and making a state ward of this girl, a half-sister to the other children of the family. That is not the intent of the law, and is just the sort of government invasion of the family circle intended to be prevented by the pro-

viso of section 11, c. 397, G. L. 1917 (section 8646, G. S. 1923), which reads as follows:

> " 'Provided, however, that in no case shall a dependent child be taken from his parents without their consent unless, after diligent effort has been made to avoid such separation, the same shall be found needful in order to prevent serious detriment to the welfare of such child.'
>
> "Without now discussing when or under what circumstances a stepmother may be considered, for any purpose, a parent of her stepchild, we hold, without hesitation, that in this case the stepmother is a parent within the meaning of this proviso. It is a bar to this proceeding, for there is no suggestion that its success is 'needful in order to prevent serious detriment to the welfare' of the child."

■ The evidence in this case shows that from the time of his marriage to the mother of Roger, Mr. Black has assumed and maintained the relationship of a father to the boy, and that he has been guilty of no misconduct or neglect which would justify a holding that he has forfeited his rights as a father. The benefit to the minor from their mutual affection and companionship is not something lightly to be cast aside. The statute under which this proceeding was brought does not, in the circumstances of this case, authorize the court's action, and the order appealed from must, therefore, be reversed.

SLOAN, J., dissenting.

My convictions will not permit me to concur in the majority opinion. The doctrine that the state may not interfere with the parent and child relationship without just and substantial cause is sound. Only those who believe in total dominion by government could disagree. This case, however, does not involve

a parent and child. It is concerned with the well-being of a ten-year old boy now deprived of both father and mother and, by the majority opinion, left to the sole care and discretion of a stranger to the blood, a stepfather. What will be said here is not intended to malign the character and, perhaps, good intentions of that man. It is to indicate that the record is not as convincing to me as it is to the majority. I find doubt that the interests of the boy will be best served by leaving him to the unlimited control of the stepfather. It appears that the conscientious trial judge was beset by the same, or greater, doubt when he entered the order retaining judicial restraint on the immediate welfare of the boy. The boy is Roger, the stepfather, Black.

The majority proceed as though Black were the parent of Roger. He was not. The relationship of stepfather and son, of itself, does not create the status of *in loco parentis*. *Sargent v. Foland,* 104 Or 296, 306, 207 P 349. And the relationship, if established, may be terminated when the family ties which created it are dissolved. 67 CJS 808, Parent and Child, § 80. The trial court apparently was of the opinion that if the legal relationship of parent and child had existed it had been terminated. The existence of the relationship is one of fact. *Ibach v. Hoffman,* 184 Or 296, 304, 198 P2d 266.

Not long after the death of the boy's mother, the stepfather placed the boy in the home of an older, married half sister of the boy, Royda Cole. Mrs. Cole also had small children of her own. From that time this young woman, and her husband, were the persons who bore the day to day responsibility of feeding, caring for and guiding the boy. It was this care that the trial court found to be good and wholesome. It

is to be remembered and emphasized that this was the only actual family relationship enjoyed by him. The trial court did not interfere with or alter it. The judge expressed confidence in the care the boy was receiving in that home and the purpose of his order was to make certain that that care continue. The majority opinion would indicate that the trial judge had interfered with this actual custody. Such is not the fact.

The evidence would establish that after Roger started living with his sister the stepfather made visits to the Cole home and on occasions would take the boy fishing, to the movies and otherwise provide recreation. Nothing in the order of the trial court would interrupt that relationship. If Black had the interest in the boy which he professed, the court order would not prevent any activity in behalf of or for the welfare of Roger that Black indicated he desired to do.

It is said in the majority opinion that there is no contradiction of the testimony quoted to the effect that Black had accepted the status of a parent. I think the evidence is contradicted, or at least partially so, by other conduct of Black.

The opinion mentions that by reason of his mother's death Roger received $73 per month social security benefits, later increased to $78 per month. This was paid to Black. After Roger moved to the home of his sister Black paid to her $50 per month from this amount for Roger's care. Other than that he actually failed to account for any of the approximate $25 per month remaining. He testified that he used it for medical expense, clothing and other nonregular costs, but could not specify any such expenditure. It must be acknowledged that he would

not necessarily have been prepared to give an accurate accounting at the hearing held. But he should have been able to give some reasonable estimate of such expenditures. He could not do so. It was mentioned that he had an income of about $5,000 per year. Despite this there is no evidence that he expended any of his own money for the care and welfare of the boy, but to the contrary it can be inferred that he used the boy's funds for his own purposes. Undoubtedly this prompted the trial court to appoint the sister as guardian of Roger's estate so that she would receive and be responsible for Roger's money. This court has held in *Gerber v. Bauerline,* 17 Or 115, 19 P 849, that when a stepfather uses the funds of his stepchildren for their care and support it deprives the stepfather of parental status. A true parent would endeavor to hoard the funds of a small child for future need and endeavor to provide his child's immediate support within the limits of his own earnings. In *Harris v. Lyons,* 16 Ariz 1, 140 P 825, 826, the court applied the same rule:

> "The law imposes upon the parent the duty of caring for his child during the period of its inability to care for itself, and only in exceptional cases may he use the estate of the latter for that purpose. * * *"

In the Harris case the court likewise had for determination the existence of parental status between a stepfather and a parentless child. The facts which prompted that court to decide that the stepfather had assumed the role of a true parent are so different than the facts in the case in hand that they bear notice (140 P 827):

> "The record shows that the appellee claimed the right to the custody of Emma from the time of her mother's death, and that he first placed her

with one of his own blood relatives; that she was left with her grandmother in obedience to a request of his wife before her death; that the grandmother's position was that of housekeeper, largely subject to the orders and direction of the appellee; that he furnished the house for them to live in, much of the time retaining a room for his personal use; that he exercised the parental rights of controlling and supervising the conduct, education, and employment of Emma, and at one time corporeally chastised her for disobedience. Practically the only surrender made by appellee was in the matter of Emma's religious training, in which he deferred to the expressed wishes of his deceased wife and the wishes of the grandmother. The rights, powers, and duties claimed and exercised by him over the child were such as only a parent could lawfully claim and exercise. * * *"

The evidence in this case does not permit a finding of the existence of any of these pertinent facts.

*State ex rel Williams v. Juvenile Court,* 163 Minn 312, 204 N W 21, is heavily relied on by the majority. That case, also, presents a different factual situation. There the father of the child in question was confined in a penitentiary. The stepmother, by dint of effort on *her* part and with assistance provided by *her* relatives, and in a home provided and maintained by *her,* gave the stepchild the same care and attention she gave to her own children. Upon such facts the court held that the stepmother was *in loco parentis.* Again, no similar facts existed in this case, except the fact that Black was a stepfather.

If in the instant case we were attempting to determine the relationship between Roger and his sister, the case would be more analogous to the Williams case. But here, the man claiming parenthood does not fulfill any duty owed between parent and child

other than claimed affection. He expends no ounce of effort to wash or mend the boy's clothes, help him with homework, render daily discipline, nor assume any of the other vexing problems or duties which confront a real parent. Nor, as we have mentioned, does he expend any of his own funds for required food and care. It is pertinent to note that the opinion in the Williams case invites comparison between that case and the case of *In re Besondy,* 32 Minn 385, 20 N W 366, 50 Am Rep 579. In the Besondy case it was held that when a stepfather uses the funds or estate of his stepchild to provide care and support for the child it rebuts any presumption that he stands in the relationship of a parent. The Besondy opinion cites and quotes from Kent's Commentaries in support of that view. The doctrine, therefore, is of ancient and well-established origin.

The cases I have examined all require a stronger showing of an acceptance of parental responsibility than that accepted by the majority in this case to establish the existence of the right sought to be established. See, for example, *Young v. Hipple,* 273 Pa 439, 117 Atl 185, 25 ALR 1541, and the annotations following the ALR report of the case, and see cases cited in extensive footnotes in 1 Schouler on Marriage, Divorce, Separation and Domestic Relations, (6th ed) § 686, p 709. These considerations, together with Black's neglect of his own child, no doubt were impressive to the trial court. And Black's neglect of his own child was more than the failure to pay support money. He courted Roger's mother while still married to his former wife and thereby neglected his own family in the process. Following the divorce from his former wife he did not visit his own child. These facts and the fair inference to be drawn there-

from also tend to contradict some of the assertions expressed in Black's behalf.

One other factor must cast equal or greater weight upon our determinations. It has been said so many times that it is almost a cliche that "great weight must be given the findings of a trial judge." In no field of the law should this rule have more strict, not lip service, application. *O'Beirne v. State,* 194 Or 389, 241 P2d 874. The character and intent of a person seeking custody of children is of great, if not paramount, importance. How can we pass judgment, in a close case, when we have not seen and have had no opportunity to observe in action the person whose character or conduct is being tested? In this particular case there were questions from the bench which lead me to believe the trial judge had doubt as to the veracity of Black. All we know are the words he answered, in print. When the questions were asked did he flush, squirm, delay his answer, shift his eyes, look longingly at his counsel or give a straightforward, unhesitating reply. We do not know. The trial judge did know. We can only know that the able trial judge was at least in doubt. I will not enforce my less informed opinion upon one who knows better than we the true character of the man in question. In cases involving the custody of a child, we should reverse the trial court only upon a clear strong showing. There is no such showing in this case. This is particularly true when we are attempting to judge upon events which occurred months or years before the case comes to our attention. In that event, of course, we can have no knowledge of intervening events. Even if it could be said that the trial court was wrong in this case we should do no more than remand the matter for further hearing. The

facts upon which we are attempting to determine the future of this boy could well have materially changed since the date of the trial court's hearing. I will not attempt to impose my judgment on the future life of a ten-year old boy upon the meager evidence before us.

As any parent well knows, there is a considerable difference between one having the responsibility of day to day feeding, clothing and guiding a ten-year old boy and one who makes an occasional visit for recreational purposes. Any trial judge experienced in custody matters knows, full well, that in a divided family the parent responsible for daily discipline and care suffers in a popularity contest with the parent who arrives occasionally to bring gifts or provide trips to the movies. It would be obvious in this case, as in others, that Roger would feel an affection for his stepfather, as well he should and continue to. But that does not prove that the stepfather should be vested with the sole determination of the future well-being of this boy.

I must emphasize again that if the effect of the trial court's order was to terminate the relationship between Roger and his sister I would heartily concur that the order could not stand. But to the contrary, the announced purpose of the trial court was to preserve this arrangement which, the evidence discloses, is the best home and only family relationship for the parentless boy. For that reason, if there were no other, I would affirm the trial court's order.

WARNER, J. and O'CONNELL, J. join in this dissent.