RAWLINGS *v.* RAWLINGS ET AL.

[83 South. 140, In Banc. No. 20792.]

J. PARENT AND CHILD. *Duty of support. Enforcement by child of duty to support.*

While it is the duty of a parent to support his infant child, yet the existence of this obligation on the part of a parent does not

justify a court of equity in entertaining a bill or action by the child against its father to determine in advance the amount of support and maintenance and compel obedience to its orders in premises by imposing a lien upon property of the parent or otherwise.

2. SAME.
   The moral obligation of a parent to support his child is not directly enforceable, and a court of equity cannot compel the performance of this duty. The duty may be enforced however under statute, or directly, as where a stranger supplies an infant with necessaries and recovers therefor against the parent.

3. HOMESTEAD. *Rights of children.*
   There is no provision in law giving a child an interest such as the wife has in the homestead or rather lands of the father.

APPEAL from the chancery court of Adams county.

HON. R. W. CUTRER, Chancellor.

Bill by Earl Rawlings and others by next friend against Thomas Rawlings. From a decree for plaintiff, defendant appeals.

The facts are fully stated in the opinion of the court.

*Ernest E. Brown,* for appellee.

I submit with confidence the lower court should have sustained the demurrer, even if the bill of complaint can be treated as if it had charged defendant was able to support complainant's and had wrongfully refused to do so. In short a child cannot successfully maintain in Mississippi a suit in any court against his father for a support. As was decided in *East* v. *King,* 77 Miss. 738, he is legally liable to those who furnish his minor child with necessaries, where it is shown he was able to furnish the necessaries and wrongfully refused to do so, but the child cannot sue the father for an allowance or act as the judge of what his father should furnish him. A disinterested third person must look into the question as to whether what he furnishes the

minor are necessaries that his father has wrongfully failed to furnish, and can only recover from the father upon alleging and proving he furnished necessaries the father could furnish and had wrongfully failed to furnish.

In many states where it is the law that a father is legally as well as morally bound to support his indigent minor child, there are statutes which prescribe how this legal duty may be enforced. In Mississippi a father who is able is liable legally as well as morally to support his minor child, who is indigent and incapable of supporting himself.

We have two statutes bearing upon the subject, to wit: Sections 3571 and 5055 (K) of Code of 1906, which reads as follows: "3571 (3148) Certain relatives bound to support pauper.—The father and grandfather, the mother and grandmother, and brothers and sisters, and the descendants of any pauper not able to work, as the board of supervisors shall direct, shall at their own charge, relieve and maintain such pauper; and in case of refusal shall forfeit and pay the county the sum of eight dollars per month, for each month they may so refuse, to be recovered in the name of the county; and shall be liable to any person who supplies such poor relative, if abandoned, with necessaries, not exceeding said sum per month."

"5055. Vagrants, who are (Laws 1904, ch. 144): The following persons are and shall be punished as vagrants, viz: Every person who shall abandon his wife or family, without just cause, leaving her or them without support, or in danger of becoming a public charge."

Under section 3571, of Code of 1906, the father of a pauper child, who is unable to work, is liable for the support of such child and to pay the county eight dollars per month or any person who furnishes the necessaries for such child not exceeding eight dollars

per month for every month he fails to furnish such child with necessaries.

Sec. 5055 (K) makes a father, who abandons his child without just cause, leaving him in danger of becoming a public charge a vagrant, and under the following section 5058 the father is made liable to commitment to jail, unless he gives bond for support of such child.

The above statutes contemplate that the county or a person furnishing the indigent child with necessaries can recover from a parent for same to an amount not exceeding eight dollars per month or that the state on an affidavit charging the father with being a vagrant on account of his leaving an indigent child without support can compel the father to give bond for support of his child for twelve months. There is however, no statute of this state or decision of this court that even hints that a child, no matter how young or indigent or helpless, can sue his father for a support. On the contrary every expression of this honorable court from its earliest history is opposed to the contention of appellees that they can maintain a suit for a support against their father. It has expressly held a minor child could not recover from his father for personal injuries inflicted by his father upon him.

"The peace of society, and. of families composing society, and of a sound public policy, designed to subserve the repose of families and the best interest of society, forbid to the minor child a right to appear in court in the assertion of a claim to civil redress for personal injuries suffered at the hands of the parent. The state through its criminal laws will give the minor child protection from parental violence and wrongdoing, and this is all the child can be held to demand." *Hewlett* v. *Ragsdale,* 68 Miss. 703, 711.

In another case decided fifteen years later or during November Term, 1916, it was decided even that one

standing *in loco parentis* towards a child is not liable
in damages to the child for chastisement inflicted upon
the child.  CALHOUN, J., in delivering the opinion of
the court said: "It is conceded and is plainly the
law, that, if Holmes stood *in loco parentis,* there could
be no civil action by the child, it is also conceded as is
clear from this record, that he was in that relation, un-
less it was changed by the testimony of the mother,
contradicted by several witnesses, that when she gave
the child, she said she was not to be whipped.  This
does not alter the relation or change the *status* of the
child, who was to be taken and treated as one of the
children of the family."  *Rosa Fortinberry by next
Friend* v. *Marshall Holmes,* 89 Miss. 373, Ib. 42 So. 799.

It is true a chancery court has jurisdiction to render
decrees for the management and sale of property of
minors, but in the instant case no property or property
rights of a minor are involved, but minors simply have
sued their fathers for an allowance and asked that the
allowance be made a lien upon property of their father.
The lower court treated the suit of the minors as if it
was one by an indigent wife for a decree for alimony
against her husband, who was able to support her and
had wrongfully failed so to do.  The chancery court is
vested with full jurisdiction of marriage and divorce by
chapter 37, of Code of 1906, and as divorces are dis-
couraged by the courts in the interest of society as well
as of the family life, this court has favored the grant-
ing of alimony to an indigent wife against an erring
husband dissolving the bonds of matrimony.  *Garland* v.
*Garland,* 50 Miss. 694; *Verner* v. *Verner,* 62 Miss. 260;
*McFarland* v. *McFarland,* 64 Miss. 449.

Where the wife is entitled to alimony either with
or without a divorce being granted her, she has an in-
terest which enables her to vacate an invalid conveyance
of the homestead by the derelict husband.  *Scott* v. *Scott,*
73 Miss. 575, 580.

The wife's right to alimony constitutes an interest in her husband's estate, which she can protect by describing in her bill of complaint the real estate of her husband upon which she wishes the alimony made a lien and by filing a *lis pendens* notice under section 3148, of code of 1906, describing the realty to be fixed with a lien for payment of the alimony. See *Gallaspy's Sons Co.* v. *Massey,* 99 Miss. 208, 216.

There is, however, no statute of this state or decision of this court that even hints a minor child has an interest in his father's estate that enables him to obtain a decree against his father for a support and fix as security for its payment a lien upon his father's realty, and the decision of the lower court is contrary to all previous expressions of this court, which deny the minor child the right to sue his father even for a personal injury.

Should the startling decision of the chancellor be affirmed and established as the law in this state, parental discipline will be undermined, the welfare of society and peace of families disturbed and the courts likely be flooded with suits by extravagant and unruly minor children against their fathers for unreasonable allowances to be fixed as liens upon real estate of their fathers, in which they have no interest whatever.

Parental discipline, the peace of the family and public policy forbid that a minor child should have the right to sue his father for an allowance and have same fixed as a lien upon the father's realty.

*L. T. Kennedy,* for appellee.

It is admitted that it is the legal duty of the father to support and maintain his children and complainants in pursuance of their legal rights ask a remedy. We will take up the questions presented in counsel's brief in their order.

He contends there is no description given in the bill of complaint of the plantations, neither the county in

10—121 Miss.

which they are located, nor whether they are income producing or not. Our answer to this is—that it is not necessary to describe the property in detail in the bill of complaint, but the *lis pendens* notice is the proper place to insert the description of the property. As to whether the property is income producing or not is absolutely immaterial upon the question of the children's right to a support from their father. The law books lay down the principle that it is the duty of the father to support and maintain his children, and we nowhere find this principle conditioned upon the fact as to whether or not his property is income producing, or whether or not he is able financially. The question of his ability financially only has to do with the amount or the station in life in which he shall maintain his children. We submit that it is not necessary that it should be alleged that the father is able to support his children.

However, the bill of complaint alleges that he is the owner of certain plantations and the *lis pendens* record in the same cause and obtained by the complainants sets up the name of the three plantations aggregating about twenty-two hundred acres.

The ability of the father to support the children is only a question going to the amount, which he should be required to expend for their support and is purely defensive and cannot be raised by demurrer.

If he is not the owner of the plantations described in the *lis pendens,* then the notice could in no wise affect him and he has no just cause of complaint with respect to such action. If he does own the three plantations, a presumption of which, we think fairly arises from the record if it is not distinctly stated as a fact, it then comes with very poor grace that he should present to this court by way of demurrer, that it should first be shown he is able to support his children, notwithstanding he owns twenty-two hundred acres of land.

In the next place, counsel urges that a child cannot successfully maintain a suit in Mississippi against its father for support. The proceeding is based entirely upon that principle of law, that makes it the duty of the father to support the child and that wherever there is a right, there is a remedy.

Section 35071, of the Code, which permits any person, who supplies a child with necessities to recover from the parent was simply granting a right to third persons, who had furnished necessities to a child, and in no wise was intended to take away from the child the remedy to pursue his own rights.

The case of *East* v. *King* 77 Miss. 738, cited by counsel only construes the statute by simply stating that a father is legally liable to one who furnishes his minor child with necessities. It does not hold that the child itself could not recover. It would place the law in a very peculiar situation to hold that a minor child had a right to demand support of its father, but that its only remedy was to induce some third person to furnish him with the necessities of life and that the third person, at his own costs, expense and risk should recover from the father of the child by showing that the father was able to support the child, that he had refused, and that the supplies furnished were necessities for the child. If such is the law, where is the third person, or the merchant, who would assume such responsibilities and take such risks to furnish the necessities for the helpless children of an unworthy parent?

Counsel for appellant relies upon the cases of *Hewlett* v. *Ragsdale,* 68 Miss. 703; *Fortenberry* v. *Marshall,* 89 Miss. 373, but both of those cases were seeking civil redress for personal injuries, suffered by a child at the instance of the parent. The court held that a child could not seek civil redress in our courts for personal injury by a parent or a person who stood *in loco parentis* towards a child or who was exercising their

parental authority. Both of those rested upon a principle far removed from the one sought to be enforced is the case at bar. Both are based upon an allegation of abuse of parental authority. The case at bar is based upon a legal right of the child and the legal duty of the father. Both of those cases were based upon an alleged commission of a wrong and this case is based upon an admitted omission of a legal duty.

It is perfectly plain to any one that our courts should not be open to children to sue their parents on account of chastisement. But it is equally as plain that our courts should be and are open to children to obtain from their father, their just rights. There is no question in the case at bar affecting or questioning the exercise of parental authority, but merely the neglect of a parental duty.

The case is not based upon section 1673 of the Code of 1906, upon the question of the court having authority to make all orders touching the care of children, when a divorce shall have been granted, but we can find a very helpful decision upon that section in connection with the case at bar. In the case of *Garland* v. *Garland,* 50 Miss. 694, annotated under the above section, it was held that the above section did not prevent the courts from entertaining bills and making decrees for separate maintainance for the wife, without a bill for divorce, the principle in the Garland case is not based upon the above section, but it is based upon the duty of the husband to support the wife and the court says, that such a proceeding is not prevented by section 1673.

It is the duty under the law for the husband to support a wife, but the wife may lose her right by wrong doing. It is likewise the duty of the parent or father to support a minor child and the right may be enforced in like manner. The right of a wife to separate maintainance, without a divorce, is not based on any statute, but

is a right by virtue of the relation and the courts afford a remedy.

We do not for one moment contend that minor children, who are living with their father and being supported in the same way he is supported, eating at his table and living in his home could successfully maintain an action against him for failure to support them. Such a parent would not be a vagrant under our statute, but where a parent does not live with his minor children, does not support them or does not contribute anything to their support, but has promised time and time again that he would do such; has three plantations and when called upon by the court even then demurs, to a bill of complaint, that asks support for six minor children, we submit that a different state of facts is submitted.

STEVENS, J., delivered the opinion of the court.

The six minor children of Thomas Rawlings, appellant, exhibited, by next friend, their bill of complaint against their father, alleging that the defendant had not lived with them or their mother for a number of years; that their father had not for a long period contributed anything to their support; that the mother was not able to care for them and that they were without means of support; that the defendant was the owner of a certain plantation, and that this plantation "is liable to them for a support." The prayer of the bill is that upon final hearing "the court will ascertain what amount is sufficient for the monthly support of said minor children, and order and decree that such amount be paid monthly by the defendant, and that the same be made a lien upon the property of the defendant," etc. The alleged plantation of the defendant is not described in the bill, but a *lis pendens* notice was filed, indicating in a general way the real estate upon which a lien is

sought. The defendant demurred to the bill, the demurrer was overruled, and this appeal prosecuted.

This is not an action for board and lodging furnished the minors, either by the mother or a third person. This is a proceeding in equity to have the chancellor fix in advance a monthly allowance for the infant children of the defendant, to enter a decree requiring the defendant to pay the sum fixed, and to adjudge a lien upon the defendant's real estate for the sums so ordered to be paid. The law as known and expounded for centuries fails to sanction any such proceeding. We recognize to the fullest extent the obligation of a parent to support his infant child, and nothing said in this opinion would discount in the least this primary obligation, imposed by the law of nature. The question before us is one as to the remedy in the case made by the bill. Does the existence of the obligation on the part of the parent justify a court of equity in entertaining a bill or action by the child against its father to determine in advance the amount of support and maintenance, and compel obedience to its orders in the premises by imposing a lien upon property or otherwise? On this point the authorities are in accord. In 21 Am. & Eng. Ency. of Law (2 Ed.), p. 1052, it is said:

"The moral obligation of a parent to support his child is not directly enforceable, and a court of equity cannot compel the performance of this duty. The duty may be enforced, however, under statute, or indirectly, as where a stranger supplies an infant with necessaries and recovers therefor against the parent."

In 20 R. C. L. par. 31, it is said that:

"The civil remedy is more commonly worked out by holding that, if the father leaves his children destitute, he confers on any one who finds them in that condition an agency to supply them with necessaries; the volun-

teer can therefore recover the cost of the supplies trom
the father in a civil action.''

Practically the same declaration is made in the text
of Cyc. (volume 29, p. 1614), and on page 1683 it is
pointed out that ''actions by children against their
parents are not to be encouraged, . . . and a minor
child has no right of action against a parent for the
tort of the latter.'' In the footnotes to the text last
quoted is our own case of *Hewlett* v. *George,* 68 Miss.
703, 9 So. 885, 13 L. R. A. 682. In this case, which ap-
pears in our reports as *Hewlett* v. *Ragsdale,* our court,
by WOODS, J., in forcible language declared:

''The peace of society, and of the families composing
society, and a sound public policy, designed to sub-
serve the repose of families and the best interests of
society, forbid to the minor child a right to appear in
court in the assertion of a claim to civil redress for per-
sonal injuries suffered at the hands of the parent. The
state, through its criminal laws, will give the minor
child protection from parental violence and wrongdoing,
and this is all the child can be heard to demand.''

This language was quoted with approval by the su-
preme court of Tennessee in *McKelvey* v. *McKelvey,* 111
Tenn. 388, 77 S. W. 664, 64 L. R. A. 991, 102 Am. St.
Rep. 787, 1 Ann. Cas. 130. There has been brought to
our attention no case which, based upon the common
law or general equity jurisdiction, sanctions this pro-
ceeding. On the contrary, the exact question was elab-
orately considered, and the point ruled adversely to the
contention of complainants, in the case of *Huke* v. *Huke,*
44 Mo. App. 308. In the Huke Case, a daughter seven-
teen years of age, by next friend, filed her petition in
equity against her father for support and maintenance.
It was there, as here, contended that the chancellor has
full jurisdiction over the persons and property of in-
fants but the court of appeals of Missouri observed:

"This action proceeds in the face of elementary principles."

The court further said: "No instance is found in the books where such an action as the present has been maintained, either at law or in equity. At one period in our English history a statute was enacted that, if any Popish parent should refuse to allow his Protestant child a fitting maintenance, with a view to compel him to change his religion, the Lord Chancellor should, by order of the court, constrain him to do what is just and reasonable. Stat. 11 & 12 W. III, c. 4. The very enactment of this statute—the necessity in the state of the law for such a statute—shows that a father was under no compulsory obligation at common law, or by the principles of equity, to support his infant child. A case arose after the passing of this statute, making this conclusion still more clear. The daughter of a wealthy Jew had embraced Christianity, and he turned her out of doors. On the petition of the parish for relief against him, they were held entitled to none, because it was not alleged that she was poor or likely to become chargeable. 1 Ld. Raym. 699. This gave occasion for another statute, which ordained that, if Jewish parents should refuse to allow their Protestant children a fitting maintenance, suitable to the fortune of the parents, the Lord Chancellor, on complaint, might make such order as he should see proper. Stat. 1 Anne, c. 30; 1 Bla. Com. 449. . . . No court of chancery in England ever made an order requiring a father, however wealthy, to set apart out of his own estate a fund for the maintenance and education of his infant child, or even to provide sustenance for such child. The common law of England has, from the earliest times, left this duty to the natural feelings of the parents, and experience has shown that the confidence has not in general been misplaced."

An in *Alling* v. *Alling,* 52 N. J. Eq. 92, 27 Atl. 655, paragraph 1 of the headnotes reads:

"1. A court of chancery has no jurisdiction to compel a parent to support an infant child."

In the opinion by PITNEY, V. C., the following language by the supreme court of Connecticut in *Finch* v. *Finch,* 22 Conn. 411, is quoted with approval:

"Connected with this obligation of maintenance there is a parental privilege. The parent is entitled to the custody and care of the child which he sustains, and to such service as it can render, and he has a right to exercise his own discretion in determining the fitness and necessity of the allowances to be made and of the support to be furnished to his children, for which he is to be made chargeable."

If the jurisdiction of equity has been enlarged in any of the states of the Union, it is certainly based upon some statute. We have in our state two statutes which indirectly bear upon the subject. Section 3571, Code of 1906 (section 6188, Hemingway's Code), imposes a duty upon certain relatives to support pauper members of their family. By this statute the father of a pauper child is made liable to the county in the sum of eight dollars per month for each month the father has failed or refused to provide the necessary support and maintenance, and furthermore is made liable to any person in like sum who supplies such poor relatives with necessaries. By section 5055 (section 3332) every person who abandons his wife or family without just cause, leaving her or them without support, or in danger of becoming a public charge, is declared a vagrant, and punishable as such. Statutes for the protection of the poor have been enacted in England, and in most, if not all, the states of the Union. The English Statute of 43 Eliz. c. 2, provides:

"The father and mother, grandfather and grandmother, of poor, impotent persons, shall maintain them,

if of sufficient ability, according as the quarter session shall direct.''

In considering the Connecticut statute, declared to be ''nearly a transcript of the English statute on this subject,'' the supreme court of Connecticut ruled that their statutory provisions ''embrace as well minor as adult children.'' *Finch* v. *Finch, supra,* 22 Conn. 416. Poor infants cannot then be said to be without some remedy. If a father, though able, becomes so depraved as willfully to abandon his offspring, he is answerable to the criminal laws of our commonwealth. But such cases must be few indeed. When they exist, they are generally the result of differences between husband and wife and a home broken up by domestic troubles. And in cases of divorce the chancery court is given jurisdiction by statute (section 1673, Code of 1906; section 1415, Hemingway's Code.) to ''make all orders touching the care, custody, and maintenance of the children of the marriage,'' that ''may seem equitable and just,'' and afterwards may ''change the decree, and make from time to time such new decrees as the case may require.''

We are not justified in enlarging the jurisdiction of chancery beyond that indicated by the statute, and in opening the door of the courts to any unruly or disobedient child who may complain at either the amount or kind of support and maintenance provided by the father. The same reasons that led the court to the conclusion reached in *Hewlett* v. *Ragsdale, supra,* are persuasive here. ''The repose of families and best interests of society forbid'' any such action. If the chancellor can fix in advance the amount of support each dissatisfied child must receive, then is parental authority superseded by judicial *fiat,* parental discipline swept away by self-assertion and disobedience on the part of children, and the integrity of the home, the corner stone of society, is undermined. The bill even prays that a lien be fixed upon the father's real estate. By no provision

of law is the child given an interest, such as the wife has, in the homestead or other lands of the father.

For the reasons indicated, the decree of the learned chancellor will be reversed, the demurrer sustained, and decree entered here in appellant's favor.

*Reversed, and decree here.*

ETHRIDGE, J. (dissenting).

After profound consideration of the question presented by this record, I find myself unable to agree with my Brethren. In my opinion their exegesis is erroneous, and fruitful of evil consequences to the helpless and unfortunate children of this state who have cruel, shiftless, heartless parents. The courts, and especially courts of equity should be diligent to discover and swift to remedy the wrongs of helpless children. It is the function of government to protect the weak and helpless from the wrongs of the strong, the cunning, and the vicious; and the fact that the strong, cunning, and vicious may happen to be the parents of the weak and helpless, instead of removing the protection, should be an additional reason for the exercise of diligence and the extending of the remedial aid of the court of equity. In order that my position may be better understood, I shall state the facts, and then my view of the law applicable to them, and afterwards consider the views of the majority, and the authorities cited sustaining that opinion, hoping to point out the errors therein contained.

The petition in this case was filed by the mother of the children as their next friend, and alleged that the petitioners were the children of the defendant (appellant), and that they were without means of support, and unable to earn a support; that they lived with their mother, away from their father; that the mother was unable to support them, and that their father was able to support them, and that it was his duty to do so;

that he had repeatedly promised to support them, but that for several years he had contributed nothing to their support; that he was the owner if a plantation in the county of their residence—and prayed that the court inquire into their complaint and fix a reasonable sum for their support, adjudge the same against defendant, and impress a lien upon his property for the security of their support, and for general relief. The defendant demurred to the bill, thus confessing the truth of the allegations contained therein; the demurrer was overruled by the court below, and appeal granted to this court to settle the principles of the case. The majority of this court has decided that the suit is not maintainable, and that no relief can be granted by equity. The children have asked for bread, and the court has given them a stone. In my opinion the parental obligation to support children can be enforced in equity at the suit of the children, suing by next friend, and that this is the only effectual remedy to insure their support. Section 24 of the state Constitution reads as follows:

"All courts shall be open; and every person for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law, and right and justice shall be administered without sale, denial, or delay."

Section 512, Hemingway's Code (section 729, Code of 1906), reads as follows:

"The declaration shall contain a statement of the facts constituting the cause of action, in ordinary and concise language, without repetition; and if it contain sufficient matter of substance for the court to proceed upon the merits of the cause, it shall be sufficient; and it shall not be an objection to maintaining any action that the form thereof should have been different."

Under these two sections it was intended by the law-making power of this state to grant a judicial remedy for the enforcement of every legal right, and that all forms of actions should be abolished, to the end that the court should not be embarrassed in enforcing rights where it had the facts before it, and should grant justice according to law, and not according to forms. It does not mean that any particular court has jurisdiction of a particular controversy, but it does mean that some court must be able to grant relief, where a legal right involving person, property, or reputation is presented. The constitutional provision, section 24 above quoted, is followed by a partition of the judicial powers among different courts, and providing in section 147 of the state Constitution that this court should not reverse a cause solely on the ground that the action was brought in the wrong court, but that, if the correct result was reached, the judgment should be affirmed, and the relief granted. The trial court retained jurisdiction, and if there be any legal right our duty is to either remand to the chancery court, from which the cause came, or to send it to the proper court for a trial on the merits. The jurisdiction of the chancery court is contained (so far as it affects this controversy) in section 159 of the Contitution of 1890, which reads as follows:

"The chancery court shall have full jurisdiction in the following matters and cases, viz.: . . .

"(a) All matters in equity;

"(b) Divorce and alimony;

"(c) Matters testamentary and of administration;

"(d) Minor's business;

"(e) Cases of idiocy, lunacy, and persons of unsound mind;

"(f) All cases of which the said court has jurisdiction under the laws in force when this Constitution is put in operation."

The Constitution grants jurisdiction to the circuit court in section 156, which reads as follows:

"The circuit court shall have original jurisdiction in all matters civil and criminal in this state not vested by this Constitution in some other court, and such appellate jurisdiction as shall be prescribed by law."

It will be seen from the sections quoted that there is jurisdiction vested in these courts for the enforcement of all rights affecting person, property, or reputation. Does this suit lie? The majority opinion concedes that it is the legal duty of a parent to support the child. There can be no legal duty without a corresponding legal right. It would be idle, yea impossible, to declare a duty without at the same time declaring a corresponding right in the person or persons to whom the duty was owed. The one necessarily implies the other. Section 1415, Hemingway's Code (section 1673, Code of 1906), provides:

When a divorce shall be decreed from the bonds of matrimony, the court may, in its discretion, having regard to the circumstances of the parties and the nature of the case, as may seem equitable and just, make all orders touching the care, custody, and maintenance of the children of the marriage, and also touching the maintenance and alimony of the wife, or any allowance to be made to her, and may, if need be, require sureties for the payment of the sum so allowed; and the court may afterward, on petition, change the decree, and make from time to time such new decrees as the case may require."

Is is reasonable to construe this section so as to make it inapplicable to other suits than divorce suits? I think not. The cases of *Garland* v. *Garland,* 50 Miss. 694, and *Verner* v. *Verner,* 62 Miss. 260, are persuasive for a different construction. There the law was as to alimony in a suit by the wife for her support, and the law, as it then existed, was that alimony was allowed

as an incident of some other suit, like a divorce suit; but the court, in an opinion of great reason and strength, held that the suit would lie, even though no other suit was pending.

The most powerful and pressing considerations, it occurs to me, present themselves in favor of a like construction here. Why should the husband escape the duty to support his children in case no divorce is asked, and be compelled to do so where a divorce is asked? Would not such construction encourage, rather than discourage, divorce? And is it not the settled public policy to discourage divorce, and encourage the discharge of legal duty?

Section 6188, Hemingway's Code (section 3571, Code of 1906), reads as follows:

"The father and grandfather, the mother and grandmother, and brothers and sisters, and the descendants of any pauper not able to work, as the board of supervisors shall direct, shall, at their own charge, relieve and maintain such pauper; and, in case of refusal, shall forfeit and pay the county the sum of eight dollars per month for each month they may so refuse, to be recovered in the name of the county; and shall be liable to any person who supplies such poor relative, if abandoned, with necessaries, not exceeding said sum per month."

Does this section provide an exclusive remedy in case no divorce proceedings are pending? Clearly not. It will be noted that the legal duty is clearly fixed upon the father to support and maintain his children at his own expense. If he does not discharge this legal duty, the board of supervisors may, if the child is maintained by the county, sue him for as much as eight dollars per month, and no more. Any private person furnishing such child support cannot recover more than eight dollars per month. If this is the exclusive remedy, the child would starve, or its living expense would have

to be made up by the public, even though the heartless father might have millions of dollars' worth of property. No person would, in this day of high cost of living, furnish a child enough to live on when he would be limited to eight dollars per month recovery against the father under this statute. The absurdity of so holding is evident. The law-making power never intended to so limit the amount that a parent should furnish, nor relieve him of any duty in the premises. What is the criminal law referred to in the majority opinion, by which this parental duty may be enforced and the child protected? Section 805, Hemingway's Code (section 1078, Code of 1906), provides:

"If the father or mother of any child under the age of six years, or any other person having the lawful custody of such child, or to whom such child shall have been confided, shall expose such child in any highways, street, field, house, outhouse or elsewhere, with intent wholly to abandon it, such person shall, upon conviction, be punished by imprisonment in the penitentiary not more than seven years, or in the county jail not more than one year."

It will be seen that this section is very limited in its scope. It does not apply at all to children over six years of age, and is then limited to particular acts, and does not apply to mere neglect. If that is the remedy for helpless children, God have mercy on them!

What about vagrancy proceeding? Section 5055, Code of 1906 (section 3332, Hemingway's Code), defines who are vagrants, and paragraph (k) of this section is the one that provides that: "Every person who shall abandon his wife or family, without just cause, leaving her or them without support, or in danger of becoming a public charge."

And paragraph (m) provides: "All persons who are able to work and do not work, but hire out their minor

children or allow them to be hired out, and live upon their wages.''

These are the only provisions pertinent to the suit before us. The proceedings for dealing with vagrants are contained in section 3335, Hemingway's Code (sec tion 5058, Code of 1906) and section 3338, Hemingway's Code (section 5061, Code of 1906).

It was provided in section 3335, Hemingway's Code, that whenever any person is arrested on a charge of vagrancy he shall be carried before a justice of the peace, and on satisfactory evidence of being a vagrant that the justice of the peace shall commit such person to jail for not less than ten nor more than thirty days, and that such person so committed shall serve his sentence, unless he shall give bond with sufficient surety for future industry and good conduct for a period of one year, and that such bond, if given, may be put in suit, and that whenever the bond so taken be forfeited there shall be no recovery less than the face value of the bond, unless the vagrant shall be delivered up to the circuit court for future trial, in which case the court may limit the amount of recovery on the bond to the cost of suit and a penalty of fifty dollars. This bond nowhere provides for the recovery thereon by the infant or the wife. The suit must be in the name of the state, and it provides no support whatever for the dependents of the vagrant. If the alleged vagrant refuses to give bond, he may be imprisoned for thirty days, and no longer. Clearly this proceeding affords no certainty of relief for the dependents of the vagrant. Section 3338, Hemingway's Code (section 5061, Code of 1906), provides for a second conviction, and provides that in such case the vagrant shall be committed to jail jail for not less than ninety days nor more than six months, and shall serve such sentence, and not be liberated from such sentence by payment for the time required to be served by such sentence. This section

11—121 Miss.

clearly makes no provisions for the children and dependents of the vagrant.

So we say that these criminal and vagrant sections do not provide for their support. In 1 Corpus Juris, p. 985, section 93, it is said:

"The violation of a right, as defined or recognized by the substantive law, constitutes a wrong and it has long been a settled pjrinciple and maxim of the law that for every right or as otherwise, and perhaps more accurately, stated, for every wrong, or for the vindication or violation of every right, there is a remedy, or, in other words, that wherever the law recognizes a right it gives a remedy to enforce it, or to redress its violation, and in the application of this principle it is immaterial whether the right is a common-law right or exists by virtue of statute. Right and remedy are reciprocal, and to deny the remedy is, in substance, to deny the right."

For essentials of an action, see 1 Corpus Juris, p. 927, and page 935, section 28. At page 986, same volume (section 95), it is stated by this same authority, under heading "Statutory Rights:"

"The rule that wherever the law recognizes a right it gives a remedy applies to statutory as well as to common-law rights; and so wherever a statute creates a new right or duty, and does not prescribe any particular remedy for its enforcement, the party entitled to the benefit of the statute may resort to any existing remedy which will afford adequate and proper redress, whether it be a common-law or a statutory remedy."

. Section 96, under the same chapter, under heading "Framing New Remedies," says:

"In order to afford a remedy for every wrong it became necessary during the formative period of the common-law actions, as new cases arose under recognized principles, to frame new writs, where none ap-

propriate to the case could be found. These writs were formerly issued out of chancery and directed to the common-law courts; but it is now well recognized that the court in whch an action is brought may, in order to prevent a failure of justice, or- to enforce a recognized principle of law, devise or adopt such new remedy or mode of procedure as the case may require, and that it is its duty to do so; but a new remedy or mode of procedure should not be resorted to, when there is an appropriate and adequate remedy already known to the law."

In section 99, p. 987, under heading "Nature and Form of Remedy," it is said:

"The rule that there shall be a remedy for the enforcement of every right, although it be a new right created by statute, does not have reference to any one particular remedy, but to such form of remedy as is appropriate to the nature of the particular case; and in some cases there may be more than one appropriate remedy."

In section 100, p. 986, of the same authority, under heading "Statutory Remedies," it is said:

"It is competent for the legislature to provide a remedy in cases where none existed at common-law, or in creating a new right to prescribe the remedy by which it is to be enforced, and limit jurisdiction of it to a particular tribunal, or to provide new remedies for pre-existing rights, and make such new remedies exclusive. Where a statutory remedy is prescribed for a particular purpose, it will be limited accordingly and cannot be used for other purposes, and in pursuing a statutory remedy the proceedings must conform to the provisions of the statute."

In section 101, same authority, at pages 988, 989, under heading "Cumulative or Exclusive Remedies," it says:

"Unless governed by some general statutory provisions, the question as to whether a statutory remedy is exclusive or merely cumulative depends primarily upon the intention of the legislature, as shown by a construction of the statute prescribing the remedy. The question is ordinarily determined according to whether the remedy is given for the enforcement of a new right created by the statute, or is merely a new remedy for a pre-existing right; but while, unless a contrary intention appears, the remedy will in the former case be construed as exclusive, and in the latter as merely cumulative, this distinction is not in all cases. controlling."

In section 102, pp. 989, 990, same authority, under heading "New Right Created with Remedy," it says:

"Where a statute creates a new right, and also provides a remedy for its enforcement, it is ordinarily held that such remedy is exclusive. This rule seems to have been first laid down with reference to remedies under criminal and penal statutes; but it applies equally to civil actions of a personal nature, and where the statute providing such a remedy confers jurisdiction thereof upon a particular court or tribunal, such jurisdiction, as well as the remedy, is exclusive. The rule is not, however, of universal application, particularly in the case of statutes which are not penal, for it is based merely upon a presumed prohibition of other remedies and will yield where a contrary intention appears."

In section 103, p. 990, under heading "New remedy for Pre-existing Right," this authority says:

"Where a statute providing a remedy does not create a new right but merely provides a new remedy for a pre-existing right, it is ordinarily held that such remedy is not exclusive, but merely cumulative, whether the right is one previously enforceable at common law, or by virtue of some other statute or constitutional

provision, and whether it was previously enforceable at law or in equity, and notwithstanding the new remedy may be preferable to or more efficient than the old."

In section 105, p. 991, under heading "Adequacy of Statutory Remedy," this authority says:

"The rule that a new remedy for a pre-existing right will not be regarded as exclusive is particularly applicable where such new remedy is not an adequate one."

Testing the present case by these rulings, we are bound to conclude, it seems to me, that these penal and criminal statutes do not provide an exclusive remedy for the enforcement of the rights of children to support by their parents. The obligation existed independent of the statute.

In 20 R. C. L. p. 622, under heading "Liabilities of Father," it is said:

"It has already been pointed out that correlative to the father's right to the custody control and earnings of his minor child is his duty to support such child. This duty is recognized and discharged even by the higher orders of the animal world and it would seem to be prescribed as to the human father by the most elementary principles of civilization as well as of law. And yet it was held in some early American cases supported by eminent English authority that 'there is no legal obligation on a parent to maintain his child, unless by force of some statute. But this doctrine admitted to seem startling and opposed to the innate sence of justice by the court which gave to it it first American support has been repudiated by the great majority of American courts. A father of sufficient ability is bound to support his minor child, though the latter has an estate of his own."

And at page 623 the same authority said:

"The practical ,difficult which undoubtedly led some courts to hold that the father's duty of support was only a moral duty is as to the method of enforcement. The very similar duty of the husband to support his wife is easily enforced by imputing to her an agency to procure necessaries on his credit, if he leaves her destitute; but in the case of the infant he is legally incapable to contract, and in most cases actually unable to contract with wisdom and 'prudence.''

While a person who furnishes an infant may recover from the father in this state to the extent of eight dollars a month, ''and no more,'' he is under no obligation to do so, especially when he might have trouble in collecting from the father. At page 625, 20 R. C. L., it is said:

"But if a father abandons his duty to his infant child, so that he is forced to leave his house, he is liable for a suitable maintenance. The principle of the distinction is that in one case the father is blameless and in the other blamable. Whether, from all the circumstances, authority from the father should be imputed to the child or to a third person to procure or to furnish necessaries on the father's credit is a question of fact for the jury. If a father permits his child to live with its mother, her adultery is no bar to an action by her to recover for support furnished to the child.''

See, also, *Van Valkinburgh* v. *Watson,* 13 Johns. (N. Y.) 480, 7 Am. Dec. 395; Schouler's Domestic Relations, p.. 327-331; *Johnson* v. *Johnson,* 2 Hill, Ch. (S. C.) 277, 29 Am. Dec. 72; *Owen* v. *White,* 5 Port. (Ala.) 435, 30 Am. Dec. 527; *Ward* v. *Goodrich,* 34 Colo. 369, 82 Pac. 701, 2 L. R. A. (N. S.) 201, 114 Am. St. Rep. 167; *Alvey* v. *Hartwig,* 106 Md. 254, 67 Atl. 132, 11 L. R. A. (N. S.) 678, 14 Ann. Cas. 250; *Spencer* v. *Spencer,* 97 Minn. 56, 105 N. W. 483, 2 L. R. A. (N. S.) 851, 114 Am. St. Rep. 695, 7 Ann. Cas. 901, and case note; *Graham* v. *Graham,* 38 Colo. 453, 88

Pac. 825, L. R. A. (N. S.) 1270, 12 Ann. Cas. 138, and case note; *Lukowski* v. *Lukowski,* 108 Mo. App. 204, 83 S. W. 274; *Biffle* v. *Pullan,* 114 Mo. 50, 21 S. W. 450; *In re Scarritt,* 76 Mo. 584; *Zilley* v. *Dunwiddie,* 98 Wis., 428, 74 N. W. 126, 40 L. R. A. 579, 67 Am. St. Rep. 820; *Watts* v. *Smylie,* 116 Miss. 12, 76 So. 684 (where this court said the husband was charged by law with the child's support and after his death it was the moral and legal duty of the mother to support it). See, also, *Dick* v. *Grisson,* Freem. Ch. 428; 5 Wait's Actions and Defenses, p. 50 et seq.; Id., vol. 8, p. 971; *Gilley* v. *Gilley,* 79 Me. 292, 9 Atl. 623, 1 Am. St. Rep. 307; *National Valley Bank* v. *Hancock,* 100 Va. 101, 40 S. E. 611, 57 L. R. A. 728, 93 Am. St. Rep. 933; *De Brauwere* v. *De Brauwere,* 203 N. Y. 460, 96 N. E. 722, 38 L. R. A. (N. S.) 508; *Rogers* v. *Rogers,* 93 Kan. 114, 143 Pac. 140, L. R. A. 115A, 1137; *Pretzinger* v. *Pretzinger,* 45 Ohio St. 452, 15 N. E. 147, 4 Am. St. Rep. 542; *Graham* v. *Graham,* 38 Colo. 453, 88 Pac. 852, L. R. A. (N. S.) 1270, 12 Ann. Cas. 137, and case note; *Cory* v. *Cook,* 24 R. I. 421, 424, 53 Atl. 315.

The majority opinion concedes that it is the legal as well as the moral duty of the father to support his minor children, but concludes that there is no remedy for the enforcement of this legal duty at the suit of the child. In *Garland* v. *Garland,* 50 Miss. 694, this court laid down the following general rule pertaining to equity jurisdiction and procedure:

"Courts of equity in America will always interpose to redress wrongs when the complainant is without full, adquate, and complete remedy at law. Here there is no such process as supplicavit, nor a distinct proceeding for the restitution of the conjugal relation. If a wife is abandoned by her husband without means of support, a bill in equity will lie to compel the husband

to support the wife without asking for a decree of divorce.''

This rule has been cited with approval in the following cases: *Dewees* v. *Dewees,* 55 Miss. 319; *Verner* v. *Verner,* 62 Miss. 263; *McFarland* v. *McFarland,* 64 Miss. 449, 1 So. 508; *Scott* v. *Scott,* 73 Miss. 580, 19 So. 589; *Moseley* v. *Larson,* 86 Miss. 294, 38 So. 234; *Ross* v. *Ross,* 89 Miss. 66, 42 So. 383.

Prior to this decision the authorities had treated alimony for the wife as an incident to some suit, such as divorce, and it was earnestly contended that, as there was no statute granting the suit without the pendency of a divorce, the relief could not be granted. In *Garland* v. *Garland,* 50 Miss. 711, 712, the court quoted from Story's Equity Jurisprudence, section 1423a, with approval as follows:

'' 'In America, a broader jurisdiction in cases of alimony has been asserted in some of our courts of equity; and it has been held that if a husband abandons his wife, and separates himself from her without any reasonable support, a court of equity may, in all cases, decree her a suitable maintenance and support out of his estate, upon the very ground that there is no adequate or sufficient remedy at law in such a case. And there is so much good sense and reason in this doctrine that it might be wished it were generally adopted.' No sufficient reason can be offered in answer to the broad proposition of Mr. Story, and the objector must rely upon the technical fact that it has not obtained in England. *Purcell* v. *Purcell,* 4 Hen. & Mun. (Va.) 507, presented three questions—marriage, desertion, and the right of the wife to a separate maintenance. The two first averments were established. As to the third the chancellor said: I hold, that in every well-regulated government there must exist a power affording a remedy when the law affords none, and this peculiarly belongs to a court of equity;

and as husband and wife are considered as one
person in law, it is evident that in this case
the law can afford no remedy, which is universally
admitted to be a sufficient ground to give this court
jurisdiction, and therefore it must entertain the bill, if
there be sufficient proof of the . marriage.' In the
opening of his opinion, the chancellor said: 'I shall
leave the clashing of the English judges to be reconciled
among themselves, and take up the question upon first
principles.' The marriage was sustained and the
prayer for a separate maintenance granted. The de-
cree required an annual payment by the husband to the
wife 'until he should restore her to the comforts of her
bed and board, and give satisfactory assurances for
her enjoyment thereof.' This decree was enforced by
committing the husband to prison for neglecting com-
pliance. He purged himself of the contempt by pay-
ing to his wife the amount due and in arear and giving
security for his future performance of the decree.

"Precisely the same question under consideration
was before the courts of South Carolina in the case of
*Prather* v. *Prather,* 4 Desaus. 33. The opinion is a
searching review of the English decisions, and a very
emphatic assertion of the equity of the rule, which,
Story says, 'it might be wished it were generally
adopted.' The court in that case observe: 'It might be
sufficient to say that, as there have been cases on both
sides of the question, . . . . I should feel myself at
liberty to select those cases for my guide which applied
to the circumstances of this country, and would best
promote the purposes of justice. . . . The subject
has been discussed, and the court has decreed that the
wife should have a separate estate from her husband, in
the case of ill usage, and a consequent separation or
desertion by the husband, though no agreement for a
separate maintenance and no divorce. . . . I allude
to several cases which were decided in this court some

years since, expressly on the ground that no other
tribunal could   give redress, and that it would be un-
seemly and highly mischievious if this court did not
interfere," See also, 2 Desaus. 198, and cases in
South Carolina therein referred to."

In 50 Miss. 713, the court also quote the Supreme
Court of Alabama as follows:

"The supreme court of Alabama, in *Glover* v. *Glover*,
16 Ala. 440, use this language: 'No one will deny but
that the husband is bound by the strongest obligations,
resulting not alone from the contract of marriage,
but founded upon the highest moral consideration,
to support his wife. And if it be true that the
law, as well as enlightened conscience, creates this
obligation, and no court can enforce its performance
or compensate for its most cruel and flagitious violation
then indeeed has one class of cases been found which
falsifies the boasted maxim "that for every wrong
there is a remedy, and for every injustice, an adequate
and salutary relief.' " And after adverting to the
disagreements of the English Chancellor, the court
also says: 'So stands the law in England, and since her
learned Chancellors have not been able to reconcile
their own decisions, we feel that we shall not be want-
ing in respect for them in adopting a rule of decision
for ourselves, which we conceive to be more consonant
with an enlightened equity, and with the fundamental
principles and maxims upon which the jurisdiction of
our courts of chancery is based.' "

In 50 Miss. 714 our court, quoting from the Kentucky
court in *Butler* v. *Butler*, 4 Litt. 202:

" 'But in equity the wife can sue the husband, and it
is the province of a court of equity  to afford remedy,
where the conscience and the law acknowledge a right,
but know' no remedy. Why, then, should the chancellor
shrink at this case and refuse a remedy? It is evident
that this arose in England for fear of intruding upon

the ground occupied by the ecclesiastical courts.' And in this quotation the whole case at bar is embraced. With us, marriage rests in contract, and the obligation is both to the wife and to society. That the remedy at law, in case of a breach of this contract, is neither full, adequate, nor complete, is plain to ordinary experience. The law's delays are proverbial. The credit of a man, stubbornly determined not to support his wife, will not feed the hungry nor clothe the naked. A man might be worth a large fortune, yet so situated as to defy judgment and execution. The credit of one so disposed would avail nothing in the market in the way of procuring supplies, as merchants will not part with their goods upon such uncertain security."

In 50 Miss. 715, 716, the court said:

"Support of the wife is the legal duty of the husband. The wife has a right to demand it; but, as her remedy, when this right is denied, is not full, adequate and complete at law, equity ought to enforce it. In abandoning the wife without good cause and refusing to support her, the husband violates a legal duty and commits a breach of contract, which entitles the wife to redress, either by divorce, or to the enforcement of the marriage contract by compelling restitution of conjugal rights to the extent of maintenance, at her option. If she chooses the latter she ought not to be starved into the former, for that would force her to abandon the marriage contract against her will."

In the subsequent case of *Verner* v. *Verner*, 62 Miss. 263, the court again held that the wife could file suit for alimony without suit for divorce.

The case of *Johns et al.* v. *Williams & Black*, 66 Miss. 350, 6 So. 207, was a suit by complainants against their mother and Williams & Black. It was alleged that the complainants were minors, except one of them, and that they had not a guardian, and the land in controversy was conveyed in and for their use, and the suit was to

enforce the trust against Williams & Black and their mother. Williams & Black demurred to the bill, and the chancellor sustained the demurrer and dismissed the bill. This court reversed, for proper relief to be granted.

In *Williams* v. *Duncan,* 44 Miss. 375, the court said: "If there were no other reason, the infancy of the complainants brings the case within the jurisdiction of a court of equity."

In *Johns* v. *Smith,* 56 Miss. 727, this court held that the chancery court had full jurisdiction over minors and their property, which must be exercised whenever nonaction would result prejudicially to the minor, and if there is no guardian the court must act without one.

In *Hurt* v. *So. Ry.,* 40 Miss, 391, it was held that an infant could sue in a court of law by next friend. See also, 22 Cyc. 627, where it is said that infants may sue at law or in equity.

Minors are peculiarly wards of the chancery court, and it was held in *Price* v. *Crone,* 44 Miss. 571, that it is the duty of the chancellor to protect the interest of minors whether the proper defense be made or not; and for this purpose they look to the record in all its parts, and, of his own motion, give to the infant the benefit of all objections and exception as fully as if specially pleaded. The infant can waive none of its rights.

In Story's Equity Jurisprudence (10 Ed.) section 1341, at page 595, it is said:

"The jurisdiction of the court of chancery extends to the care of the person of the infant, so far as necessary for his protection and education; and as to the care of the property of the infant, for its due management and preservation, and proper application for his maintenance. It is upon the former ground, principally, that is to say, for the due protection and

education of the infant, that the court interferes with the ordinary rights of parents, as guardians by nature, or by nurture, in regard to the custody and care of their children. For although, in general, parents are intrusted with the custody of the persons, and the education of their children, yet this is done upon the natural presumption that the children will be properly taken care of, and be brought up with a due education in literature, and morals, and religion, and that they will be treated with kindness and affection. But whenever this presumption is removed, whenever (for example) it is found that a father is guilty of gross ill treatment or cruelty towards his infant children, or that he is in constant habits of drunkenness and blasphemy, or low and gross debauchery, . . . the court of chancery will interfere, and deprive him of the custody of his children, and appoint a suitable person to act as guardian, and to take care of them, and to superintend their education."

In *Leibold* v. *Leibold*, 158 Ind. 60, 62 N. E. 627, it was held that suit would lie in equity against the father for the support of his minor children, independent of any statute. In that case the suit was filed by the wife for the support and custody of their minor children; the only distinction between that and this being that this suit is merely for the support without any suit as to custody. The proceeding did not conform to a statutory proceeding in Indiana. At page 61 of 158 Ind. (62 N. E. 627), the court said:

"This proceeding, however, was not brought under the act of 1881, nor does the sufficiency of said second paragraph depend upon that act. The power of a court of chancery to control not only the estate, but the person and custody, of infants, is well settled"—citing 2 Story's Eq. (13 Ed.), sections 1341, 1341a, 1345; 1346; 3 Pomeroy's Eq. Jur. (2 Ed.), section 1307; *Cowls* v. *Cowls*, 8 Ill. (3 Gilman) 435, 44 Am. Dec. 708.

In 3 Pomeroy's Eq. Jur. (2 Ed.), section 1307, it is said: "In addition to its power to appoint guardians, the court of equity will also exercise its jurisdiction, in a proper case, and to promote the highest welfare of the infant, where there is already a guardian, natural or legal, by controlling the person of the infant, and by removing it personally from the custody of its natural or legal guardian, even from the custody of its own parents. By the common law, as well as by the law of nature, the father is the natural guardian of his infant children. It is not only the father's right, but his imperative duty, to have custody of the persons of the infant children, and to educate and train them so as to promote their future well-being as members of society. The equitable jurisdiction over the persons of infants is based upon this parental duty, and is an indirect means of enforcing it by furnishing a remedy for its violation. The jurisdiction is a delicate one; it rests in the highest degree upon the enlightened discretion of the court, and will only be exercised when plainly demanded as the means of securing the infant's present and future well-being. It is well settled, therefore, that a court of equity may interfere on behalf of infants, and remove them from the custody and control of their father or mother, whenever the habits, practices, instruction, or example of the parent, exerting a personal influence on the infants, tend to corrupt their morals and undermine their principles, or when the parent is neglecting their education suitable for their condition in life, or is endangering their property, or is guilty of ill treatment or cruelty towards them."

In discussing the jurisdiction of the Chancery court pertaining to its control over minors, Lord ELDON, in English chancery, in the case of *Wellesley* v. *Duke of Beaufort,* 2 Russell, 23, says:

"Wherever the power of law rests with respect to the protection of children, it is clear that it ought to exist somewhere; if it be not in this court, where does it exist? Is it an eligible thing that children of all ranks should be placed in this situation—that they shall be in the custody of the father, although, looking at the *quantum* of allowance which the law can compel the father to provide for them, they may be regarded as in a state little better than that of starvation? The courts of law can enforce the rights of the father, but they are not equal to the office of enforcing the duties of the father. Those duties have been acknowledged in this his majesty's court for centuries past. Having thus shortly alluded to some of the cases, and referring to the cases themselves for a more large exposition of the grounds upon which this jurisdiction stands, I repeat that I find myself in this seat humbly representing his majesty, and bound by the settled law of the land. I cannot now retire from the discharge of this duty; I dare not violate the principles which grow out of the practice of the court. My duty is to apply those principles honestly, to look diligently to all the circumstances of the case, and, with judicial integrity (by which must be always meant an integrity of the purest nature), to determine manfully, and manfully to declare what my opinion is."

Again, at star page 28 it is said: "I was anxious upon that point for another reason, namely, because, reflecting upon the nature of the jurisdiction as connected with property, it appears to me that whilst the court looks at the duties of the father, it considers those duties as duties that impose upon him thus much —that if he be himself of ability to maintain the children (be their fortunes what they may), and to provide for them according to their expectations it says, 'You shall provide for them out of your own means, and not encroach upon the property of the

children.' What does the court do further with respect to the maintenance of children in a certain class of society? Can any court of law do that which this court is in the constant habit of doing, and of doing most usefully for families and the public? In many great families, the eldest infant is in the possession of a large property; the young infants have some little property; and in such a case the court does not measure the duty of maintaining the eldest child by looking at him only, but it considers that it is for his interest that his brothers and sisters should be brought up in respectable stations; and it says, 'We will go the length of giving them maintenance, or a part of maintenance, out of his provision, as a part of the maintenance made for him, though to be applied to them,' and upon this ground: That it is for his benefit, not that this portion of his fortune should be saved, but that it should be applied to bringing up his brothers and sisters to such situations as to reflect honor upon him.''

In the case of *Prather, by next friend* v. *Prather,* 4 Desaus. 33, the South Carolina court was called upon to deal with a situation analogous to the present case. Bill was filed in this case by a wife who lived separate from her husband to recover alimony on the ground of ill usage and being turned away by her husband. The defendant demurred to the bill, and the court held that it had jurisdiction and made allowance in proportion to the husband's fortune. At page 35 it is said, after setting out the allegations of the bill:                    ,

"This bill makes a very shocking case, outrageous to humanity, and disgraceful to civil society. The question then arises: Is there no remedy for such enormous evils? and if there is, where is it to be had? The delicate trust is committed, in the country from whence we have borrowed our jurisprudence, though in particular cases the court of equity has interposed to give

relief, as shall be more particularly noticed hereafter. But there are no ecclesiastical courts in this country, which can give relief. It is equally clear that the courts of law cannot give any relief. The nature and constitution of those courts, and their forms of proceeding, render it impossible for them to interfere in such case. We are brought, then, to this conclusion—either that these gross injuries must pass without redress, or this court must interpose and give relief. It is shocking to think that such conduct, so inhuman in itself, so injurious to innocent and helpless women, and so mischievous to society, should pass unheeded and unchecked in a civilized country. It is the boast of our jurisprudence that for every wrong there is a remedy, and for every injustice an adequate and salutary redress. But this would be a vain and empty boast, if for such a case as this there was no remedy."

And at page 38, discussing the wife's right, the court said:

"She acquires by her marriage, in return for the comfort she brings, the right to maintenance and support, and to a participation in the enjoyment of her husband's property, according to his degree and situation in life, while she demeans herself correctly; and this right she may exercise in an irregular, unsettled, vexatious manner, by running in debt for necessaries, upon his deserting her, which he would be compelled to pay. But this is a very uncertain method, and full of inconvenience and productive of constant litigation. Few will trust a woman under such circumstances, when they are sure of not being paid without suits, and the measure is entirely uncertain."

The same may be said with increased emphasis of the condition of the helpless children in the present case. Few would be willing to trust them with a sufficiency for their comfort, if they must depend upon the result of the suit and the consequent uncertainty of the

amount to be received, or of receiving anything at all. At page 39 of the case of *Prather* v. *Prather,* in 4 Desaus. (S. C.) *supra,* the court said:

"The want of a more specific remedy than can be obtained in the courts of law gives a concurrent jurisdiction to a court of equity in a great variety of cases, as in executory agreements. A court of equity will compel them to be carried into strict execution (unless where it is improper or impossible), instead of giving damages for nonperformance. So, too, in questions that may be tried at law in a great multiplicity of actions. A court of equity assumes a jurisdiction to prevent the expense and vexation of endless litigation and suits. Now, if the court of equity has concurrent jurisdiction with the courts of law, merely because it can give more ample or complete relief with less litigation, surely it follows that it will be justifiable to interfere where the courts of law can give no relief at all, as is acknowledged in the case under consideration."

In most of the cases dealing with this subject the suit has been brought by the wife, and generally for moneys or credits expended by her for the support of the children. But manifestly the right of action, whoever may bring it, is rooted in the legal obligation of the father for their support, and it is not a right of the wife as such, but it is the right of the children, and the judgment is made to her as the trustee for their benefit. Many of the cases already cited furnish ample authority for the procedure, and the authorities in this state, which I have already cited, show that children may sue for any right which they have, at least in the equity court.

I proceed now to a consideration of the authorities cited in the majority opinion, the principal of which is *Huke* v. *Huke,* 44 Mo. App. 308. The basis of this decision, and the only theory upon which it can be

upheld on legal reasoning, is that the duty of the father to support his child is a mere moral obligation, as distinguished from a legal obligation. The court said (44 Mo. App. 312):

"By the common law of England a father is not bound to support his infant child, in the sense that the obligation has any legal sanction; no action can be maintained against him, without the aid of statute, to compel him to discharge this natural duty. By that law a father is not liable, as upon an implied contract, to a stranger who furnishes necessaries for the support of his infant child."

If this statement were true, and if there were no legal obligation on the part of the father to support the child, then the conclusion of the majority would be sound. As is shown above, the overwhelming weight of authority is against this announcement, and as the majority opinion confesses that there is a legal obligation on the part of the father to support the child, this authority does not sustain the reasoning of that opinion. At pages 313, 314, of 44 Mo. App. the Missouri Court of Appeals said:

"But it is suggested, in argument, that this petition is addressed to the chancery powers of the circuit court, and that the Chancellor of England had, in virtue of a delegated authority from the king as *parens patriæ,* or, as was sometimes said, the father of the fatherless, a power to require a father, having the means, to set apart a fund for the support of his indigent minor child. That court has again and again asserted a species of vice regal power over the custody and education of children, in virtue of a delegated authority from the king as *parens patriæ.*"

It is settled that a court of equity of this country and of this state has the power that a court of chancery in England had, and represents the state as *parens patriæ,* exercising the same jurisdiction that the English chan-

cery courts exercise. The judge delivering the opinion in *Huke* v. *Huke*, 44 Mo. App. at page 314, after the above recital, said:

"In the exercise of that jurisdiction it will appear that the English Court of Chancery went so far as to level orders and decrees against parents and guardians residing in foreign countries—in France and America—and that it stood ready to enforce those decrees by imprisoning the defendants in the Fleet, whenever they should set their feet upon the soil in England."

It will be seen from a careful reading of this opinion that the decision would have been otherwise, had the court recognized the duty of a father as a legal duty, instead of a moral duty. There are only a few states in America that agree that a duty is not a legal duty, and Mississippi is not one of those that consider it a mere moral duty. Legal and moral obligations frequently co-exist. In such cases the courts will enforce the obligation, and it is a legal duty to enforce them, but the courts will not enforce a mere moral duty. This case of *Huke* v. *Huke* has been cited by many text-books for the proposition that a child cannot sue a parent, and the text-writers in some of the courts have cited it without referring to the reason underlying the decision, and without pointing out the different results which will flow from a recognition of the duty as a legal one. This is the only case which I have found directly holding that proposition. It ought not to prevail in any jurisdiction recognizing the legal obligation of the parent to support the child. The other cases referred to in the majority opinion are not applicable to this suit.

The case of *Alling* v. *Alling*, 52 N. J. Eq. 92 et seq., 27 Atl. 655, cited in the majority opinion, in which it was said that a court of chancery has no jurisdiction to compel a parent to support an infant child was a suit brought by the mother against her only child and

daughter, alleging that the mother has been a widow since 1876, and that the daughter was born in 1874. The claim was for support, maintenance, and education furnished by complainant from the time of the death of her husband and until date, and for an order for allowance of support during the minority of the daughter out of the fortune of the infant. The daughter had recently come into a small fortune from two sources, namely, a part of her father's estate, which is in her mother's hands as administratrix, and a part from an uncle in the hands of her guardian. The funds coming from her father were vested in him before his death under the will of his father, the grandfather of defendant, but were subject to a life estate in the widow of the testator, who died in 1889. Under the will the executor paid the complainant as administratrix about eleven thousand, five hundred dollars. Of this sum the complainant is entitled to one-third, leaving her daughter, the defendant, less than eight thousand dollars. The other fund from her uncle amounted to six thousand, eight hundred and fifty dollars. At page 99 of 52 N. J. Eq., and page 658 of 27 Atl. of the opinion, it is said in reference to the obligation of parents to support their children:

" 'By begetting them, therefore, they have entered into a voluntary obligation to endeavor, as far as in them lies, that the life which they have bestowed shall be supported and preserved; and thus the children will have a perfect right of receiving maintenance from their parents.' This duty and this obligation have been variously modified by the positive laws of civilized countries, but fully recognized by all. Connected with this obligation of maintenance there is a parental privilege. The parent is entitled to the custody and care of the child which he sustains, and to such service as it can render, and he has a right to exercise his own discre-

tion in determining the fitness and necessity of the allowances to be made, and of the support to be furnished to his children, for which he is to be made chargeable."

At page 110, 52 N. J. Eq., and page 662 of 27 Atl., it is said:

"In looking over the account, I find that the child was maintained in a style which, in my judgment, was quite beyond her pecuniary expectations, and I cannot approve its payment out of her fortune. If the mother chose to support her in such style, I think she must pay a part of the expense from her own income, which was nearly three times that of the child."

The case of *Finch* v. *Finch,* 22 Conn. 411, referred to in the majority opinion, is a suit by a wife against her husband on a book debt, after divorce, in which he had been awarded the custody of the children. The suit was for the entire support and education of such children after such decree has been granted. The court held that the entire account could not be recovered. The majority opinion, at page 421, said:

"It seems to a majority of the court that the sole obligation of supporting the children, which was thrown upon the husband and father by the state of coverture, is essentially changed, or modified, by the dissolution of the marriage; and now their pecuniary condition and ability may be equal or otherwise. The mother may have ample means, and the father none; and in such case, surely, it would be inequitable to charge the father with the entire maintenance of the children, while they remain in their mother's service, and under her exclusive control; and we do not believe the common law imposes any such obligation."

Two of the judges dissented. It is clear from this case that it is not in point here, and does not sustain the holding of the majority.

In the case of *Hewlett* v.. *George, Executor,* 68 Miss. 703, 9 So. 885, 13 L. R. A. 682, Judge WOODS, of this court, said:

"The peace of society, and of the families composing society, and a sound public policy, designed to subserve the repose of families and the best interests of society, forbid to the minor child a right to appear in court .in the assertion of a claim to civil redress for personal injuries suffered at the hands of the parent.. The state, through its criminal laws, will give the minor child protection from parental violence and wrongdoing, and this is all the child can be heard to demand."

This utterance, as applied to the facts of that case, is a correct pronouncement. The facts show a condition that was very grave facing the parents to control their minor daughter, who was guilty of practices that would bring irreparable wrong and shame to her family. She was committed to an insane asylum, and most people would sympathize with the family in the step taken. I apprehend that this court would never hold that a suit by a child against a parent for a permanent injury, willfully and maliciously inflicted, would not lie.

I have a great regard for the distinguished judge who wrote the opinion in *Hewlett* v. *George, Executor,* and I cannot bring my mind to believe that he and his distinguished associates would have held that in no condition could a minor child sue a parent. I think that the true rule is that the parent has a right to exercise a reasonable restraint and inflict chastisement for the purpose of correcting a child, and in the discharge of his duties, while acting within the limits of reason, he has the discretion as to what chastisement and the kind of support he will furnish, and is not to be required to maintain his children in luxury and ease even though he may have ample means to do so, and that the parent is the judge, within reasonable

limits, as to the amount of chastisement that he will inflict, and is not responsible for an error in judgment so long as the facts bring the case within the limits within which reasonable men may differ. The court is not, in such case to substitute its judgment for that of the parent; but when the father refuses to perform his duties, and makes no effort to supply the. needs of his children, then the court, acting as the *parens patriæ* for the state, looking out for the child's welfare, will, and of right ought to, compel him to do so. The language in *Hewlett* v. *George* went beyond the calls of the case.

The state will not rely entirely upon criminal law for the protection of children from neglect and maltreatment by parents for several reasons: First, it is wholly inadequate for that purpose. The children are under the control and restraint of the parents, and have not sufficient intelligence and opportunity to set the criminal law in motion or to attend and prosecute. It is contrary to human nature for them to want to prosecute. It accomplishes nothing for the child, as the placing of parents in jail does not clothe the body, nor satiate the pangs of hunger, nor nourish the body. It does not protect the body from the bleak bites of the wintry winds, nor stay the pangs of starvation. If the parent has to pay a fine, his ability is diminished to that extent. If he is placed in jail, he is not able personally to look after his children, and in either event his resentment is aroused and his anger is enkindled, and the child will suffer more, instead of less, by trying such remedies. If the remedy at law is inadequate, equity ought to take jurisdiction, and it is one of the maxims both of the common law and of the equity court that no wrong will be allowed without a remedy. See Broom's Legal Maxims, pp. 191-195; 16 Cyc. 30, 133.

The majority quotes from 29 Cyc. 1614, and on page 1663, and says:

"It is pointed out that 'actions by children against their parents are not to be encouraged, . . . and a minor child has no right of action against a parent for the tort of the latter.'"

The majority fails to quote that part of Cyc. which quotes from the case of *Bird* v. *Black,* 5 La. Ann. 189, where the court said:

"Suits of children against parents are not to be encouraged, unless to redress clear and palpable injustice."

I heartily concur in the opinion from Louisiana on the facts there presented.

I cannot concur in the holding that the repose of society would be adversely affected by maintaining the suit in the present case. Any society that can consent to see children neglected by able parents, and whose repose would not be more disturbed by seeing children starved, maimed, and brutally handled, than it would be by seeing the law make the parent fulfill his duties and obligations to his child, ought not to be tolerated at all. What philosophy is this now promulgated, which say sthat suits in chancery will disturb society when criminal prosecutions of parents by children will be when the helpless children are allowed to go hungry and unclothed, their vitality so lowered by starvation and exposure as to make them invalids, unable to perform the functions of citizenship, but, on the contrary, make them a burden, and perhaps a menace, to society? If there be such society in existence it ought to be kicked off the earth, and forced to do its reposing in the abysmal pits of Gehenna, where children do not go.

HOLDEN, J., concurs.